## No. 10,067.

### MRS. HATTIE E. WEYMOUTH vs. THE CITY OF NEW ORLEANS AND J. T. AYCOCK.

Under a contract with reference to a public market by which the sole right conveyed by the city to the third person is the right to collect and appropriate the market revenues, the market remaining subject to all the regulations, control and authority of the city applicable to every other market, the *thing let* is not the market-house, but only the privilege or franchise of receiving the revenues, the market remains the premsies of the city and not of the lessee, and the latter does not incur the obligations of a tenant of property to keep the premises safe for those lawfully entering thereon.

When, however, a person has, by contract with public authority, assumed obligations to keep a public highway or other public place in repair, he may be held liable to one who has been specially injured by reason of his failure to perform such obligation.

In such case plaintiff must prove: 1. That defendant has been guilty of legal fault. 2. That such fault was the cause of the accident.

When the evidence fails to show that the fault imputed to the defendant was the cause of the injury, and makes it probable that the injury resulted from a different cause, which operated independently of the fault, defendant cannot be condemned.

Warranty is a covenant, express or implied, arising out of a contract. A person sued for a *quasi offense* is responsible only on the ground that he has committed a fault, and he cannot call another to warrant him against responsibility for his own faults.

APPEAL from the Civil District Court for the Parish of Orleans. *Rightor*, J.

---

*J. B. Guthrie* for Plaintiff and Appellee.

*W. H. Rogers*, City Attorney, for the city of New Orleans, and *W. S. Benedict* for J. T. Aycock, Defendants and Appellants.

---

The opinion of the Court was delivered by

FENNER, J. The petition recites that Mrs. Hattie E. Weymouth was the mother of Leila and Alice Weymouth, aged nine years and seven months, respectively.

That her said two daughters were killed August 16, 1886, by falling

into a well situated in the market-house, on Magazine street, between Berlin street and Napoleon avenue, known as the Upper Magazine Market.

That the death of these children resulted from the fault and was caused by the negligence and lack of skill on the part of the city of New Orleans and Jordan T. Aycock, their servants and agents.

That said market and its approaches have been open to public use for years.

That same was built by Thomas Carey under a contract with the city of New Orleans.

That by said contract, in place of a fixed price, Carey was vested with the right of occupancy and possession of said market-house, buildings and improvements, and the portion of ground whereon same is erected, and with the right of collecting and holding the revenues to be derived from said market-house, and with the right of carrying on a market therein for a period of eighteen years under the conditions of said contract, which is annexed to and made part of the petition.

That Carey had the right to assign and transfer his rights.

That since August 5, 1881, Jordan T. Aycock had been assignee of all Carey's rights under said contract, and that all the duties devolving upon said Carey by virtue of said contract and the operation of the law have devolved and attached to said Aycock since the 5th of August, 1881.

That the city was bound to maintain the market, its walks, approaches and thoroughfares in good and safe condition, and that a like duty devolved upon Aycock as subrogee to the rights and obligations of Carey, under the contract wherein Carey specifically binds himself and assigns to keep said market in good order and condition and to make all necessary repairs thereto.

That at the end of said market property nearest Camp street as an appurtenace to the market exists and has existed for years a deep well or underground cistern.

That said well is located upon and under a public thoroughfare, and on one of the walks and approaches to the said public market.

That the opening down into said well consists of an iron tube or ring fifteen to twenty inches in diameter, said tube being set down into the ground so that its upper rim is perfectly even with the surface of said walk.

That no guard or railing is constructed around the mouth of said well to give a hint of its existence or location to wayfarers.

That the well has been and is left without cover, or without ade-

346 SUPREME COURT OF LOUISIANA.

Weymouth vs. City of New Orleans and Aycock.

quate or secure cover over its said mouth, and is a deathtrap and a constant menace to life (7).

That said contract provides " that a force and lift pump should be placed over said well with necessary pipe and hose, and the well to receive the necessary repairs " (7).

That said provision has never been complied with, or if it has, Jordan T. Aycock has removed same and leaving the mouth of said well unguarded and insecurely and improperly covered.

That on the 16th of August, 1886, her daughter Lelia, carrying in her arms the baby, Alice, while walking through said market-house, fell through the mouth of and into said well left open and unguarded or insecurely covered through the fault and negligence of Aycock and the city of New Orleans, their agents and employes (8).

Under these allegations, coupled with appropriate averments as to the nature and amount of the damages, she claimed a judgment against the city and Aycock *in solido* for $25,000.

The city filed an exception of no cause of action, on which a final judgment was rendered sustaining same and dismissing the suit as against the city. From this judgment no appeal has been taken, and it is now absolute.

Aycock pleaded a general denial, and also filed a call in warranty against the city, which was cited as warrantor and answered denying its liability.

The case was tried before a jury, and resulted in a verdict and judgment for $10,000. in favor of plaintiff against Aycock, and in favor of Aycock against the city as his warrantor.

### I.

The judgment against the city as warrantor is so preposterous that Aycock's learned counsel hardly ventures to defend it in this Court. Warranty is a covenant express or implied, arising out of contracts. There is no allegation or pretence that the city has failed to comply with any of the obligations of its contract. The sole ground of this action is an alleged *quasi offense,* and if Aycock is responsible at all, it must be because he has been guilty of some *fault* which occasioned the damage. If the damage resulted from the joint or concurring fault of the city and Aycock, they might both be jointly or solidarily liable to the plaintiff, as claimed in the petition ; but the city's liability on that ground, so far as this action is concerned, was finally settled by the judgment in her favor. Nothing remained at issue except the question whether Aycock is liable by reason of his own fault ; and

certainly one party cannot be required to warrant another against the consequences of the latter's own faults.

The city, therefore, passes entirely out of the case, and the sole question to be determined is whether Aycock has been guilty of any legal fault occasioning the damage and rendering him responsible therefor.

## II.

It is first important to determine Aycock's precise relation to the market by a critical examination of the contract between the city and Carey, in whose shoes, as his assignee, Aycock stands.

The market-house, which had existed upon this *locus publicus* belonging to the city from an ancient date, was burned down. This contract embodies an undertaking on the part of Carey to build a new market-house in conformity to elaborate specifications, in consideration of the right to receive the revenues of the market during the period of eighteen years from the day the market should be completed and accepted by the city.

The only right conveyed to Carey was, in the language of the contract, " the right and privilege of collecting and receiving, for his own use and benefit, the revenues of the market to be built by him," as to which the city subrogated him " to all and singular her rights, actions and privileges to sue for and collect said revenues, but, in no wise, guarantees to the said Carey the payment of any of the fees or charges required to be paid by occupants of the stalls."

The right so conveyed was accompanied by the following obligations, viz:

1.  Carey bound himself, " at all times, to abide by, conform and comply with, all and singular, the terms, clauses and conditions of any and all ordinances or regulations that are or may be in force, or that may be hereafter adopted by the city, touching or concerning the government of the markets of the city of New Orleans;

2.  He bound himself " to keep the said market in good order and condition, and to make all necessary repairs thereto, and at the expiration of the present contract, to return the said market to the city, in good order and condition and in thorough repair."

It was further stipulated that the city would not, during the term of the contract, " alter, change or modify the fees, or charges that are now, by existing ordinances, required to be paid by occupants of stalls."

We have no occasion to examine the terms of the subsequent transfers by Carey; since he could transfer nothing but the rights which he acquired.

From the foregoing we consider it clear that the thing let was not the market, but the privilege or franchise of collecting and appropriating the revenues; that the city accepted, owned and held the market-house as a public market and *locus publicus*, subject to her own control, regulation and police authority, precisely as was every other public market in the city; and that Carey and his assignee acquired no right, authority or control over the same except said right and privilege to receive the revenues.

The market-house was and remained the premises of the city and not the premises of Carey or Aycock.

Hence, Aycock cannot be held bound by the general obligations of a tenant of immovables under a contract of lease, or of any other controlling occupant, under which such an occupant of premises is bound to keep them safe for those lawfully entering upon them. Sherman & Redfield Neg. § 361; 1 Thomson Neg. pp. 316 and 317.

The execution of the contract conforms to the foregoing plain significance of its terms. Defendant never pretended to exercise any authority or control over the market except to collect the revenues and clean it up as often as required. The city had her commissary for this market as for all others, and no difference is indicated between the authority she exercised over this and that over other markets.

## II.

There is, however, another well-settled principle of law, under which a person who has, by contract with the public authorities, assumed specific obligations to keep a highway or other public place in repair, is held liable to anyone who is specially injured by reason of his failure to perform such obligation. Sherman & Redfield, Neg. §§ 345, 353; Wilson vs. Jefferson, 13 Iowa, 181; Phillips vs. Com., 44 Penn. St., 187; Robinson vs. Chamberlain, 34 N. Y., 389; Fulton vs. Baldwin, 37 Ib. 648.

If Aycock is liable at all it can only be under the application of the foregoing principle to the obligation assumed in the contract "to keep the said market in good order and condition and make all necessary repairs thereto."

The well into which the children fell was situated in the rear of the market-house near the edge of its banquette, was built flush with the banquette, had an opening about fifteen inches in diameter and was covered by an iron lid, which moved by lifting it out the place into which it fitted, and sliding it off like the top or lid of a common stove.

NEW ORLEANS, MARCH, 1888. 349.

Weymouth vs. City of New Orleans and Aycock.

This well had existed in the same place and with the same covering from the time when the market was originally established, very many years before the contract with Carey. It was not injured by the fire. It had never at any time been locked or guarded. It had always been regarded and used as a public well. It was situated in a part of the city to which the waterworks did not extend. The neighbors came in dry seasons to get water from it for washing purposes or to water their stock. Drivers watered their horses there and used it for washing off their vehicles. Fire companies used it for testing or exercising their engines.

At the very time when this accident occurred there were some buildings in course of construction near it, and the masons came to this well for water to mix their mortar and for like purposes. The surface of the water was only about three feet below the banquette, and this made access to it easy and convenient by tying a short rope or string to vessels and drawing up the water.

It is plain that nothing in Carey's contract imposed the duty, or even conferred the right, to interfere with this original and continuous public use, or to lock up the well, or to erect guards around it. He was, at most, only bound to maintain it in the condition in which it was when the contract went into effect and to suffer it to be used as it had always been used.

There is evidence, however, to show that, by long use, the lid had become worn and loose, so that when stepped upon by a passenger it would tilt up and slide off the opening, thus creating danger. It may possibly have been the duty of Aycock to have corrected this defect by repairing the lid; and if it were clearly proved that the accident had resulted from such defect, the question as to his responsibility might be more serious. But the evidence also shows that persons of the public using the well often forgot or carelessly omitted to close the lid. This was an incident of the public use which Aycock had neither the duty nor power to prevent. It was equally likely to occur whether the lid was in good or bad repair, and a person injured by stepping into the well while thus left open by one of the public who had the right to use it, surely could not hold Aycock responsible.

There was no witness to the accident in this case. The elder child with the infant in her arms, had parted with her companions to go home; the nearest route being through the market. They were missed, and, after search, were found drowned in the well. The evidence does not indicate that the weight of such children in stepping on the lid would have been sufficient to tilt and open it, or that, if it had

been, they would not have escaped falling into so narrow an opening. All the probabilities arising under the evidence strongly corroborate the theory that the well had been left open, and that the child having the infant in her arms, possibly in such position as to obstruct her vision, stepped into the opening and fell through.

The plaintiff necessarily carries the burden of proving two things: 1. Fault on the part of Aycock. 2. That the fault was the cause of the injury. Cases are cited holding that, in the absence of direct evidence, these facts may be sufficiently established by circumstances and presumptions clearly supporting them. See Hays vs. Gallagher, 72 Penn. St. 139; Allen vs. Willard, 57 Ib. 380; Whitney vs. Clifford, 57 Wis. 158; Seyboldt vs. R. R. Co., 95 N. Y. 562.

But where, as in this case, the circumstances and presumptions point to a cause of the accident not occasioned by defendant's negligence, and for which he is not responsible, such authorities are not applicable. The verdict of the jury obviously indicated that they considered the city, and not Aycock, responsible.

It is alleged in the petition, as one ground for Aycock's liability, that under the specifications of Carey's contract for building it was required that "a force and lift pump of suitable size be placed *over the well*, with necessary hose and pipes for cleaning the market, the well to receive necessary repairs." The evidence shows that Carey built the pump, not over the well, but some feet from it, as it had previously existed. This was a matter exclusively between the city and Carey, and as the city accepted the work it is conclusively presumed that the variation was made with her consent and approval.

It is further claimed, in argument, that Aycock's failure to keep the pump in repair was a cause of the public's opening the well. No such allegation of fault is contained in the petition. The evidence shows that even when the pump was in repair the public found it more convenient to draw from the well and often did so, as it had always done. Moreover, the cause, even if it had been alleged, is too remote and is not sustained by the evidence.

On the whole, we feel bound to hold that the plaintiff has not made out such a case against Aycock as would justify us in throwing upon him responsibility for the lamentable accident.

It is, therefore, ordered, adjudged and decreed that the verdict and judgment appealed from be annulled and set aside, and that there be judgment in favor of defendant and warrantor, rejecting plaintiff's demand, at her cost in both courts.

Rehearing refused.