[L. A. No. 4100.   In Bank.—March 2, 1917.]

GEORGE CHAFOR et al., Respondents, v. CITY OF LONG BEACH (a Municipal Corporation), Appellant.

MUNICIPAL CORPORATIONS—MAINTENANCE OF AUDITORIUM—PROPRIETARY CAPACITY—LIABILITY FOR NEGLIGENCE.—A municipal corporation acts in its private and proprietary, as distinguished from its governmental, capacity, in constructing and maintaining an auditorium in pursuance of the permissive authorization given by the act of 1903 (Stats. 1903, p. 412), and is liable to one lawfully on such premises for personal injuries resulting from its negligence in maintaining the structure, notwithstanding it derived no pecuniary benefit from the use being made of the building at the time of the injury.

ID.—ABSENCE OF PECUNIARY GAIN FROM USE OF BUILDING—GOVERNMENTAL FUNCTION.—The fact that the municipality reaps no direct

pecuniary return from the use of the building for a particular purpose, does not make its act in so using it the performance of a governmental function.

ID.—BUILDING ERECTED ON TIDE-LAND.—It is immaterial to the liability of the city that the building was constructed in part upon tide-lands belonging to the state, and that its construction and maintenance of the building under such circumstances was *ultra vires.*

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order refusing a new trial. Paul J. McCormick, Judge.

The facts are stated in the opinion of the court.

Haas & Dunnigan, Byron C. Hanna, Stephen G. Long, George F. Kapp, Wilbur F. Downs, and George L. Hoodenpyl, for Appellant.

William A. Alderson, for Respondents.

Harry M. Irwin, Waldo M. York, T. E. Gibbon, Valentine & Newby, Kemp, Mitchell & Silberberg, Leo V. Youngworth, Harry A. Hollzer, T. A. Williams, Steely & Jeffers, *Amici Curiae,* on behalf of Respondents on a prior petition for rehearing.

HENSHAW, J.—This action was brought by the husband and by the minor son of Edith Chafor to recover damages for the death of Edith, occasioned by the negligence of the defendant city. Trial was had before a jury, resulting in a verdict for the plaintiffs. Judgment followed the verdict, and from that judgment and from the order of the court denying defendant's motion for a new trial it prosecutes this appeal.

Long Beach is a maritime city. Prior to the accident it had constructed and was maintaining a wharf or pier extending into the ocean. The superstructure of this pier was supported by piles driven into the beach and ocean-bed. Near the outer end of this pier, and a little distance from it, the city had built and was also maintaining a structure known as an auditorium. The approach to the auditorium from the pier, a distance of about forty feet, was by means of a platform. From this platform doors gave entrance on to the main floor of the auditorium. The 24th of May, 1914, was

the birthday of Queen Victoria. Certain of the inhabitants of Long Beach and of adjacent territory proposed to assemble in the auditorium for the purpose of celebrating this "Empire Day." A set program for the ceremonies and entertainment had been announced. In effect such part of the public as was interested in the event was invited to attend. Edith Chafor was a resident of the city of Los Angeles, and went to Long Beach for these ceremonies. They were inaugurated by a street parade headed by the municipal band. This parade was to end at the auditorium. While it was on the march people assembled on the platform, seeking admission to the auditorium. The doors were closed, so that a crowd collected on this platform. It gave way under the weight of this crowd, and carrying with it a part of the underpinning and superstructure of the auditorium building proper, precipitated some two hundred of the assemblage on to the beach sands twenty or more feet below. Edith Chafor was one of these, and her dead body was removed from the wreckage.

As the question whether or not the city of Long Beach, which admittedly had built and was maintaining this auditorium and its approach, was doing so in a governmental capacity is the principal question presented on this appeal, it becomes pertinent to point out that the construction and maintenance of this auditorium, which was essentially a hall for public assemblages and gatherings, were not enjoined upon the municipality by positive law. Therefore the duty of maintenance was not a duty imposed by law. The auditorium was constructed under the permission of a statute of 1903. (Stats. 1903, p. 412.) This statute authorized and permitted a municipality to issue bonds and incur indebtedness for the purpose of constructing and maintaining such "public assembly or convention hall." It provided that the legislative body of the city "shall have power to appoint such officers or agents and to make and enforce such rules and regulations as may be necessary for the management, control, letting, and use of such public assembly or convention halls." It further provided that "all moneys derived from the use or hire of such assembly or convention hall shall be deposited in the treasury of the municipality to the credit of said public hall fund." After specifying the first applications to be made of the moneys thus received, it further declares that

"any surplus remaining . . . may be appropriated and used for general municipal purposes." It is not in controversy but that this particular assembly hall was maintained under the provisions of this act, and that its management and control, also under the provisions of the act, were in the hands of defendant's board of public works. Control of the actual letting or permission to use the hall was retained by the city council.

The evidence discloses that upon the day in question the right to the use and occupancy of the hall had been given to an organization known as the Sons of St. George, and that the auditorium would be open to the general public after the Sons of St. George, with the paraders and their friends, had been admitted. The parade was led by a lieutenant of the city's police, with a number of the police force. These were followed by the municipal band. The mayor of the city and his wife were in the first automobile. The destination of all was the auditorium, which, under these circumstances, the mayor himself had entered just prior to the disaster. It cannot be said then that Edith Chafor was a trespasser at the time and place of her death. She was at least a licensee by permission or invitation, and if the city is responsible at all it is responsible for the exercise of ordinary care to see that such a licensee is not injured. (*Schmidt* v. *Bauer*, 80 Cal. 565, [5 L. R. A. 580, 22 Pac. 256] ; *Means* v. *Southern California Ry.*, 144 Cal. 473, [1 Ann. Cas. 206, 77 Pac. 1001] ; *Hontz* v. *San Pedro etc. R. R. Co.*, 173 Cal. 750, [161 Pac. 971].) With the ground thus cleared of these minor obstructions we can approach unhampered the consideration of the principal proposition: Was the city of Long Beach, at the time and on the occasion of this accident, managing this assembly hall in its governmental capacity or in a private and proprietary capacity?

To the resolution of this question we now come, prefacing the consideration by the statement, which will hereinafter be abundantly established, that there is no substantial controversy over the governing law. With the decision of the case of *Russell* v. *The Men of Devon*, 2 Term. Rep. 667, and the cases which followed it, it became an established principle of the English common law that an individual could not sustain an action against a political subdivision for negligence in its performance of any governmental function, nor of any

public function expressly ordained and commanded by law. The reasonings supporting this were various.  At times it was declared that it was better for the individual to suffer than for the public to be inconvenienced, and that this principle was stronger than that other and conflicting one which declared that for every injury the law gives a remedy.  The city was but a hand of the sovereign and it was the "right divine of kings to govern wrong."  Later it was argued that the moneys of a municipal corporation were designed to be devoted to public ends, and that it would be a misapplication of them to permit any part of them to be used in the liquidation of private damages.  But this principle of decision, while firmly established where not abrogated by statute, failed to commend itself alike to jurists and to legislators, and it was argued that as neither a political subdivision nor yet the state itself could injure a man's property without compensation, it seemed somewhat fallacious and absurd to say that it could negligently injure him or destroy his life without liability to compensation for its wrongdoing.  It was a clear instance, so it was argued, of making the rights of property higher and more sacred than the rights of man.  Thus it came about that courts soon made a discrimination in these cases between the purely governmental or ordained functions of the municipality, for remissness in the performance of which it was not liable, and those which, though undertaken and performed for the general benefit of the inhabitants of the municipality, were neither ordained nor in their nature essentially governmental.  And recognizing, as has been said, the inherent injustice of the established rule, the disposition of the courts on the one hand was to uphold such actions under a very rigid construction of the phrase "governmental functions," while upon the other hand the legislatures in many states by positive enactment did away entirely with the distinction and made municipal corporations liable to precisely the same extent for the same acts as were private corporations.  And indeed it may be added that, even without legislative sanction, in at least one instance the highest court of a state has repudiated as unsound the distinction between the governmental and private functions of a municipal corporation, and has declared that in every case the mode and measure of the liability of a public corporation should be that prescribed as to an individual or a private corporation.

(*Bowden* v. *Kansas City*, 69 Kan. 587, [105 Am. St. Rep. 187, 1 Ann. Cas. 955, 66 L. R. A. 181, 77 Pac. 573].) And in this state it is not without interest to point out that the legislature has in terms imposed this liability upon all counties, cities, and cities and counties by a statute enacted in 1911 (Stats. 1911, p. 1115), though by reason of the fact that the substance of this enactment was neither declared nor hinted at in its title it is undoubted that for this reason the act is void. (*Brunson* v. *City of Santa Monica*, 27 Cal. App. 89, [148 Pac. 950].)

Again it is important to note that the true test does not rest upon the determination as to whether or not the municipality is reaping a monetary gain. A very large class of cases , arises where this fact is established, as where parts of public buildings, such as a city hall, are leased or rented to private individuals, when it is uniformly held that the city in doing this thing is acting in a private capacity. But while it is true that the exaction of a rent or the making of a private profit is a very potent factor in determining the character of the act, the converse is not true. In other words, the act does not become governmental merely by virtue of the fact that the city from the performance of it reaps no direct pecuniary return. It may be and is equally a private, proprietary act if no financial return at all be exacted, or if the financial return which is exacted does not amount to a profit on the enterprise. The true principle has too often been confounded with the mere question of pecuniary gain. We may be excused, therefore, in elucidating this fact for quoting at some length. Thus in Dillon on Municipal Corporations, fifth edition, section 109, the principle is thus aptly and admirably stated:

The powers of a municipal corporation are . . . denominated "governmental, legislative or public; the other, proprietary or private. . . . On distinction of these powers rests the doctrine of the common-law liability of municipal corporations. In its governmental or public character the corporation is made, by the state, one of its instruments, or the local depository of certain limited and prescribed political powers, to be exercised for the public good on behalf of the state rather than for itself. . . . But in its proprietary or private character, the theory is that the powers are supposed not to be conferred, primarily or chiefly from considerations connected

with the government of the state at large, but for private advantage of the compact community, which is incorporated as a distinct legal personality, or corporate individual; and as to such powers and to property acquired thereunder, and contract made with reference thereto, the corporation is to be regarded *quoad hoc* as a private corporation, or at least not public in the sense that the power of the legislature over it or the rights represented by it, is omnipotent.''

The text of the learned author will be found supported by every well-considered adjudication. Noteworthy amongst these is the case of *City of Galveston* v. *Posnainsky*, 62 Tex. 118, [50 Am. Rep. 517], where the distinction between governmental and proprietary functions is elaborately considered and it is said:

''The tendency of the decisions is evidently to recognize the liability of even *quasi*-corporations to suit not expressly given by statute, when injury results from the negligence of officials or agents exercising powers purely ministerial in reference to matters which cannot be said to pertain to duties purely public; to matters which, though in a restricted sense are public, yet more directly affect the welfare and pecuniary interest of the inhabitants of the *quasi*-corporation, upon whose will rests the determination whether the given act shall be performed and how it shall be performed, and upon whom rests solely the expense of the work put in operation by themselves, through which, at least indirectly, they receive benefit in which the general public, if at all, but slightly participates. . . .

''It would seem that, in so far as municipal corporations of any class, and however incorporated, exercise powers conferred on them for purposes essentially public—purposes pertaining to the administration of general laws made to enforce the general policy of the state—they should be deemed agencies of the state, and not subject to be sued for any act or omission occurring while in the exercise of such power, unless, by statute, the action be given; that, in reference to such matters, they should stand as does sovereignty, whose agents they are, subject to be sued only when the state, by statute, declares they may be. . . .

''In so far, however, as they exercise powers not of this character, voluntarily assumed—powers intended for the private advantage and benefit of the locality and its inhabitants —there seems to be no sufficient reason why they should be

relieved from that liability to suit and measure of actual damage to which an individual or private corporation exercising the same powers for a purpose essentially private would be liable.''

We have thus been at pains to set forth the principle determinative of the question as to whether or not a particular act pertains to the governmental rather than to the proprietary activities of a city, because the discussions of some courts, notably those of Massachusetts, have been misconstrued upon the element of pecuniary gain. *Hill* v. *City of Boston*, 122 Mass. 344, [23 Am. Rep. 332], illustrates this. It is to be noted that the court is there dealing, and so expresses itself, with the ''neglect of a public duty imposed upon it [the municipality] by law for the benefit of the public and from the performance of which the corporation receives no profit or advantage.'' The particular case was an action of tort against the city of Boston to recover damages for injuries received by a child while attending a public school, under the express duty imposed by general law to maintain such public schools, and it is held that the municipality is not liable. The supreme court of Massachusetts did not in any way broaden the definition of governmental functions as applied to municipal acts. It did not rest its decision, as well it might, upon the proposition that the maintenance of public schools, being a duty enjoined upon the municipality, partook of the nature of a governmental function. Nor yet, while recognizing and declaring that it was a duty, the performance of which was enjoined upon the city by general law, did it exonerate the city for liability on this account, but held and declared that in the performance of such *ordained* duties the city would not be liable when the performance of the duty was not connected with any pecuniary benefit to the municipality, thereby plainly implying that even though the duty were ordained by general law, if it contemplated any pecuniary benefit to the municipality, it would stand liable as would a private individual. To illustrate the unwillingness of the Massachusetts courts to extend the doctrine of municipal immunity, the case of *Dickinson* v. *City of Boston*, 188 Mass. 595, [1 L. R. A. (N. S.) 664, 75 N. E. 68], is instructive. The city of Boston was by law responsible for the negligent maintenance of its public streets. To prevent accidents on those streets it was not required by

law to light them at night. However, by a permissive statute the city "was authorized but not required to maintain lamps to light its streets." It maintained such lights for the general benefit of the inhabitants, for their general safety, and specifically to lessen the danger of accidents upon the highways. One of its lamp-posts, negligently maintained, fell and injured the plaintiff. In his action brought to recover damages these matters are discussed, and it was urged, amongst many other reasons, that the city was not liable in that it was reaping no pecuniary benefit from the maintenance of the lights, but that the benefit was a general public benefit to the inhabitants. The supreme court of Massachusetts made answer: "It was unnecessary for the plaintiff to show that any direct commercial profit had been derived. The indirect benefit thus conferred supplied a sufficient motive for the defendant's action. Having voluntarily taken the enterprise for its private benefit, and not acting in the performance of any public duty, it is liable for negligence in the management of its corporate property when used for such purposes." (Citing numerous cases.) Still further, as showing the limits within which the courts circumscribe the meaning of the phrase "governmental function," may be cited *Ehrgott* v. *Mayor of New York,* 96 N. Y. 264, [48 Am. Rep. 622], where it is held that it is settled by a long line of decisions that municipal corporations proper, having the powers conferred upon them respecting streets within their limits, owe to the public the duty to keep them in a safe condition for use in the usual mode by travelers, and are liable in a civil action for special injury resulting from neglect to perform this duty; and the *City of Kokomo* v. *Loy* (Ind.), 112 N. E. 994, where the supreme court of Indiana applies the same doctrine to injuries resulting from the negligent upkeep of a public park as well as public streets.

That the distinction between governmental and private functions has been adopted as the principle governing the adjudications in this state, our decisions leave no doubt. Thus in the early case of *Touchard* v. *Touchard,* 5 Cal. 306, 307, it is said: "A corporation, both by the civil and common law, is a person, an artificial person, and although a municipal corporation has delegated to it certain powers of government, it is only in reference to those delegated powers that it will be regarded as a government. In reference to all other of

its transactions, such as affect its ownership of property in buying, selling, or granting, and in reference to all matters of contract, it must be looked upon and treated as a private person.'' In *Bloom* v. *San Francisco,* 64 Cal. 503, [3 Pac. 129], in the conduct of the municipal hospital the city and county maintained a nuisance. Action was brought to recover damages occasioned by this nuisance, and it was held that ''the city and county of San Francisco had such proprietorship of the city and county hospital as rendered it liable for damages in the case presented.'' In *South Pasadena* v. *Pasadena Land etc. Co.,* 152 Cal. 579, [93 Pac. 490], it is declared that in the carrying on of a water service for the benefit of South Pasadena the city of Pasadena will not be acting in its political, public, or governmental capacity. And in *Davoust* v. *City of Alameda,* 149 Cal. 69, [9 Ann. Cas. 847, 5 L. R. A. (N. S.) 536, 84 Pac. 760], this court, reviewing our cases, and drawing the indicated distinction between governmental and proprietary functions, held that the negligent operation of an electric-light plant by the city, which light plant was operated for the twofold purpose of lighting the city and furnishing electric light and power to its inhabitants, made the city liable, upon the ground that it was not exercising any governmental power or function.

Nor is it difficult to set forth the definition of governmental functions as applied to a city. Under the theory of the common law, that the municipality is protected from liability only while exercising the delegated functions of sovereignty, the governmental powers of a city are those pertaining to the making and enforcing of police regulations, to prevent crime, to preserve the public health, to prevent fires, the caring for the poor, and the education of the young; and in the performance of these functions all buildings and instrumentalities connected therewith come under the application of the principle. (*City of Kokomo* v. *Loy* (Ind.), 112 N. E. 994.)

But it is of course true that modern cities and towns enter upon many forms of activity, operate utilities for the benefit of the inhabitants, and provide many means for the easing or improving of the condition of the people that were never dreamed of at common law. Nevertheless the uniform holding as to all such activities on principles manifestly just to the people themselves is that no matter how beneficial they may be in a general sense to the inhabitants of the munici-

pality, unless they are governmental in their essence, the municipality's conduct in managing them is controlled by the same rules of liability that apply to an individual. Thus, while schoolhouses, city halls, jails, firehouses, are with much uniformity held to be instrumentalities for governmental purposes, no such rule applies to other buildings constructed by a municipality, though for the benefit, convenience, or advantage of its people. And even in the case of strictly governmental buildings, if the city shall let a portion of one of them to a private tenant, while retaining control of the rest, that tenant is entitled to his recovery for the city's negligent maintenance of his premises. (*Worden* v. *New Bedford,* 131 Mass. 23, [41 Am. Rep. 185].)

But when the building is one constructed and maintained not for governmental purposes, then are the authorities uniform that even though it be so maintained under permission of the statute, and though it be maintained for the benefit of the inhabitants, or for such of them as may desire to use it, the municipality acts in a private, proprietary capacity and is liable for its torts as would be a private individual. The cases so holding with reference to municipal water-plants and their structures, and gas-plants and their structures, are so numerous as not even to call for specific citation. The same rule is universally applied to market-houses built by the municipality and maintained for the convenience of the people. (*Barron* v. *Detroit,* 94 Mich. 601, [34 Am. St. Rep. 366, 19 L. R. A. 452, 54 N. W. 273]; *Town of Suffolk* v. *Parker,* 79 Va. 660, [52 Am. Rep. 640]; *Weymouth* v. *New Orleans,* 40 La. Ann. 344, [4 South. 218]; *Baltimore* v. *Brannon,* 14 Md. 227.) As instances of the application of the same rule to other buildings may be cited *Libby* v. *Portland,* 105 Me. 370, [18 Ann. Cas. 547, 26 L. R. A. (N. S.) 141, 74 Atl. 805], *Henderson* v. *Kansas City,* 177 Mo. 477, [76 S. W. 1045], and *Cowley* v. *Borough of Sunderland,* 6 Hurl. & N. 233. In this last case the borough of Sunderland, under the permission of a Victorian statute, maintained baths and washhouses for the use of the inhabitants. The argument was there made that the woman, injured in a mangle, which it was charged was negligently constructed and maintained, was a mere volunteer and licensee, and electing to use the machine could not recover. But answer was made that the statute was passed for the benefit of the poor and more ignorant

classes of the population. The corporation chose to avail itself of its powers to erect these washhouses, and in the discharge of the statutory duty thus undertaken it was bound to exercise ordinary care and diligence.

What, then, remains to be said concerning the building here under consideration? It was not a structure, the maintenance of which was enjoined by law. It was not a building used for any of the governmental functions of the municipality. True, it was maintained for the benefit of the municipality in the sense that it afforded the populace a meeting place for many forms of amusement and instruction. But in all these respects it differed no whit from any other auditorium or assembly hall built and maintained by private capital for the same purposes. The city had full charge of it, could let it out, or refuse to let it out at its pleasure. The act under which it was authorized, though not compelled to build it, contemplated that it should be let for profit, and that the proceeds of these lettings should go to defray the expense of maintenance and the cost of construction. That in any individual instance the city allowed it to be used without a rental charge, no more affected the governing principle than it would be affected if a private proprietor did the same thing. The payment of rent, much or little or none at all, did not transform the particular use of this assembly hall, which use was let or permitted for the celebration of the birthday of a foreign potentate, into a governmental function of the city of Long Beach. Appellant in its brief declares the proposition to be ''whether the law authorizing the act was such as authorized a proprietary or governmental institution and in this respect the design of the act is the main thing to be held in mind and not the result.'' Considering that design, and therein noting that the act provides for a rental charge for the use of the assembly hall, and contemplates that that rental charge should or may be sufficient to pay for the operating expenses, to provide a sinking fund, and even to contribute to the general funds of the city, can it be doubted for one moment that in the view of the legislature the city was simply empowered to enter into a proprietary business for its personal advantage and financial gain? Upon the other hand, that the city of Long Beach maintained this assembly hall for the very purposes indicated by the legislative permission is made manifest by the

offered official resolution of the city, "fixing the charges for the use of the public auditorium in the city of Long Beach." In this resolution we find that conventions or mass meetings not for the purpose of financial gain, whether the assemblage be of the residents or nonresidents of the city of Long Beach, may have the use of the auditorium free. If financial gain enter into the purpose of the convention or mass meeting, then the charge shall be from twenty-five to one hundred dollars per day. When used by nonresidents of the city of Long Beach for purposes of entertainment and amusement the charge is $35 a day. When used by residents of the city of Long Beach for like purposes of amusement the charge is $15 a day. When used by nonresidents of the city of Long Beach for purely charitable or philanthropic purposes, if "an admission is charged, the proceeds to be used outside of the city of Long Beach, the charge shall be $25 a day. If only a collection is taken, the charge shall be $15." Wherein is to be drawn the slightest distinction between the use and operation of the city of Long Beach of this hall and the same use and occupation if it were owned by an individual and let for identical purposes? Nor does the fact that in an individual instance no rental charge was made at all affect the proposition, nor work a modification of the governing principle. A private individual granting the use of his hall for this occasion without rental charge would not be exonerated. The city of Long Beach, doing precisely the same thing, stands in precisely the same legal position. Therefore we consider the conclusion absolutely unescapable, upon principle and under the authorities, that the city of Long Beach was acting in a private and proprietary capacity in the general maintenance of this assembly hall, and was likewise so acting upon the specific occasion here in question when it was there let or its use permitted for the celebration of "Empire Day."

Neither of the California cases relied upon by appellant is at all in point. In *Melvin* v. *State,* 121 Cal. 16, [53 Pac. 416], plaintiff sought to recover damages from the state for injuries received at the state fair at Sacramento, and received a verdict which was set aside on motion. This court held that the state was not liable for two reasons: First, that it had distinctly disclaimed liability for the acts of its agents —the state board of agriculture—in declaring that "in no event shall the state be liable for any premium, award or

debt created by said board of agriculture," and it declared that such a liability for injury was within the meaning of this language.   Second, it held that the state board of agriculture was a mere corporate agency of the state for public and governmental functions, saying: "We find none of the elements of a private corporation in its creation, its powers, or the mode of their exercise.   Its objects are public and educational. . . . It exists for the sole purpose of promoting the public interest in the business of agriculture and kindred objects.   It is an agency of the government, and in no sense an organization for pecuniary profit to the state." *Denning* v. *State*, 123 Cal. 316, [55 Pac. 1000], was an action by an employee of the harbor commission to recover for injuries received while in the employ of the commission as a night deckhand on a tug belonging to the state.   This case is distinguished in *Davoust* v. *City of Alameda*, 149 Cal. 69, [9 Ann. Cas. 847, 5 L. R. A. (N. S.) 536, 84 Pac. 760], and in the latter case it is pointed out "that the plaintiff when injured was employed in a distinct branch of the service, viz., the protection against or extinguishment of fires, which, even in the case of municipal corporations, is uniformly held to be the exercise of a purely governmental function."

The negligent maintenance of the structure was sufficiently established by the evidence to justify the implied finding of the jury.

The conclusion already expressed concerning the general purpose of the construction of this auditorium, and the specific purpose of its use upon the day in question, does not at all depend upon the evidence which was introduced to the effect that the city did not charge any rental upon the day in question, and that it did rent portions of the auditorium for purposes of private gain.   The fact that no rental was charged upon this particular day is in no wise determinative of the question, and the evidence of the rental for gain of portions of the structure and of the pier, even if excluded, could not have changed the inevitable result.

The appellant sought to introduce evidence to prove that the building was constructed in part upon tide-lands belonging to the state, and that its construction and maintenance of the building under these circumstances was *ultra vires*. We can perceive no possible force to this contention, and

state it only that it may appear that it has not been overlooked.

The judgment and order appealed from are therefore affirmed.

Melvin, J., Lorigan, J., Sloss, J., and Lawlor, J., concurred.

SHAW, J., Dissenting.—I dissent from the opinion of the majority of the court. On the main question of the liability of municipalities for the negligence of their officers whereby personal injuries are caused, I am satisfied with the views expressed by Victor E. Shaw, Justice *pro tem.*, upon the decision of the case at the former hearing. The following are the parts of that opinion wherein the question is discussed:

"Conceding negligence on the part of the officers and employees of the city by reason of which Edith Chafor was killed, is defendant liable in damages to the plaintiffs for such loss as they may have sustained by reason of her death? Municipal corporations in the performance of their functions act in a double character. (Dillon on Municipal Corporations, 5th ed., secs. 38, 1303.) In the one they, as subordinate agencies of the state, are intrusted with the exercise of limited governmental powers for the benefit of the local public, in the performance of which, in this state there being no statutory provision, they are not liable for the negligence of their officers, agents, and servants through whom they act. (See concurring opinion of Justice Shaw in the case of *Davoust* v. *City of Alameda,* 149 Cal. 69, 75, [9 Ann. Cas. 847, 5 L. R. A. (N. S.) 536, 84 Pac. 760], and authorities there cited.) In the other, they may exercise powers conferred, not for the benefit of the public, but for their own private and pecuniary profit, in which case they are, in exercising such powers, liable for damages resulting from the negligence of their officers, agents and employees to the same extent and governed by the same rules as are applicable to corporations or individuals engaged in like business. (*Davoust* v. *City of Alameda, supra; Esberg Cigar Co.* v. *Portland,* 34 Or. 282, [75 Am. St. Rep. 651, 43 L. R. A. 435, 55 Pac. 961]; *Western Sav. Fund Society* v. *Philadelphia,* 31 Pa. St. 175, 183, [72 Am. Dec. 730].)

"This distinction is recognized and conceded by counsel for respondents, who insists that the construction, maintenance,

and use of this assembly hall was not a governmental function, but that it was maintained, used, and operated purely as a corporate enterprise from which the city in its private or proprietary character received revenue, emolument, and gain, just as a city does in operating a lighting or water plant by means whereof the city distributes to its citizens, for hire and tolls, electric current or water. If respondents' position be sustained, it must follow that the city should be held liable to plaintiffs in damages. In support of their contention, respondents insist, first, that the statute heretofore referred to, pursuant to which bonds were issued for the construction of the hall, fixes the character thereof as private and proprietary; and, second, that the evidence shows that the assembly hall was erected and maintained by the city in its proprietary capacity, and from the letting of which and exacting rentals for the use thereof it derived revenue, gain, and profit.

"Respondents' proposition that the character, use, and maintenance of the assembly hall or auditorium is conclusively fixed as proprietary, as distinguished from governmental, is based upon section 8 of the legislative act referred to (Stats. 1903, p. 412), pursuant to which, as stated, bonds were issued and from the proceeds of the sale of which the building was constructed. This section provides: 'All moneys derived from the use or hire of such assembly or convention hall shall be deposited in the treasury of the municipality to the credit of said public hall fund, and shall be applied, exclusively, to the following purposes, to wit, First—For the necessary expenses of conducting, maintaining, and insuring such hall, and of making all improvements and repairs thereof. Second—For the payment of installments of interest or principal becoming due on said bonds until the whole of said bonded indebtedness shall have been paid. Third— Any surplus remaining after providing for the purposes, first and second above specified, may be appropriated and used for general municipal purposes.' At the time in question the city of Long Beach, operating under a freeholder's charter, had a board of public works, which, not only as provided in section 9 of the act, but in the charter as well, committed to said board the control, management, letting, and use of such hall. Save as to these provisions, the act is silent as to the capacity, whether governmental or private, in which the city should

construct and maintain the hall. That the city might let the
hall for private use, exacting a rental therefor, admits of no
question. The act itself, however, does not restrict nor pur-
port to limit the power of the city to such use of the hall. On
the contrary, as declared pursuant to section 2 thereof, the
public interest and necessity demanded the construction of
such hall, which, as we construe it, was intended for use by
the city in a dual capacity; that is, both governmental and
private. It might be and, as shown by the evidence, was used
as a meeting place for its legislative body; for gatherings to
discuss questions of public interest; for religious and political
conventions; for recreation, amusement, or educational pur-
poses, the function of providing a place for such meetings be-
ing purely governmental in character for the general benefit
of the public. (*Clarke* v. *Inhabitants of Brookfield*, 81 Mo.
503, [51 Am. Rep. 243].) On the other hand, as determined
by the city, it might, through its proper officers, let all or any
part of the structure for private uses, exacting rentals there-
for, in which case the revenue derived must be applied as
provided by section 8 of the act. In the case of *Davis* v.
*Rockport*, 213 Mass. 279, [43 L. R. A. (N. S.) 1139, 100 N. E.
612], it is said: 'A municipality has the power to let for profit
real estate held for public purposes and not needed for the
present for such a purpose. It is not compelled to let the
property lie idle. . . . It either could allow the property to
remain unused or it could let the same or a part thereof for
profit. If it took the former course, it was answerable only
as a municipality in possession of property intended for pub-
lic use. If it took the latter course then it became answerable
as a private owner.' Not infrequently cities, anticipating
future needs, acquire property for a public use and until de-
voted to such purpose let the same for private use for hire.
The city of Los Angeles furnishes an illustration of the prin-
ciple here stated. It holds real estate purchased for public
purposes which, not presently required therefor, it lets for
private uses. In Dillon on Municipal Corporations, fifth edi-
tion, section 1657, it is said: 'It has been held that the main-
tenance of a city hall for the use of the city officers and
employees as well as for the transaction of the city's business,
is the exercise of a governmental function, and that the city
cannot impliedly be held liable for negligence on the part of
its officers and agents in maintaining and repairing the city

hall or in controlling and managing the same. But the liability of the city has been sustained where the city has rented out the city hall building or some considerable part thereof, and the person injured had come to the building to transact business with the city's tenants.' (*Little* v. *City of Holyoke,* 177 Mass. 114, [52 L. R. A. 417, 58 N. E. 170].) The principle is further illustrated by city water systems which, like this hall, serve a dual purpose; one being governmental in supplying water through hydrants for fire protection, and the other private in supplying water for profit for the use of its inhabitants. If an individual sustains damage by reason of the negligence of the city in the operation of a plant for supplying water to its inhabitants, it, like an individual, is liable therefor. (*Denning* v. *State,* 123 Cal. 316, [55 Pac. 1000] ; *Esberg Cigar Co.* v. *Portland,* 34 Or. 282, [75 Am. St. Rep. 651, 43 L. R. A. 435, 55 Pac. 961].) On the other hand, if the damage results from the operation of the plant in the exercise of the power of the city in affording protection from fire, then the city is not accountable for such damages. (*Judson* v. *Borough of Winsted,* 80 Conn. 384, [15 L. R. A. (N. S.) 91, 68 Atl. 999].) Our conclusion is that the act was not designed as requiring the hall to be constructed and maintained by the city in its private corporate character for emolument and gain, but that it was intended for either private or governmental use, varying from time to time, as the city, through its proper officers, might determine.

"Since there is nothing in the act of the legislature which fixed the capacity in which the city held and conducted the hall or restricted the purpose for which it should be used, the question becomes one of fact to be determined from the evidence.

"This brings us to respondents' second proposition, namely: that defendant at all times conducted and operated the assembly hall, not in the exercise of a governmental function, but in the capacity of a private corporation and proprietor thereof, by letting the same for private uses and reserving rental for such use. It does not appear from the record that the board of public works which, under the charter and act of the legislature, had control of the letting and charge of the hall, ever at any time authorized the use of it for holding the exercises on what was termed 'Empire Day' to commemorate the birthday of Queen Victoria. Indeed, so far as disclosed,

the committee of persons in charge of the celebration assumed the right to hold the exercises there, without consulting with defendant or any of its officials. Waiving this informality, however, and conceding that such authority and right were implied, no pretense or claim is made that the hall *was let for hire, or that any rental or revenue was exacted' for its use on said occasion*. Indeed, with the exception of one occasion in *March, 1910*, when the assembly hall was by the city council, for a consideration of $25 paid to the city clerk, let for the purposes of a lecture delivered therein, the record fails to disclose that the assembly hall proper, as disconnected from two booths or rooms, was ever at any time let for hire for any private purpose whatsoever. On the contrary, during the same period of time, it appears that the city, at large expense for services of janitors and other necessary charges of maintenance, has devoted it to the use of the public, wherein to hold political, religious, and other meetings, concerts by the municipal band, school commencements, and, indeed, all sorts of meetings of a public nature and for the public benefit, for which no rental or charge was exacted. Notwithstanding such fact, however, the trial court, upon the apparent theory that the structure wherein the hall was located, together with the pier and wharf, should be regarded as one unit and the whole thereof be deemed a 'public assembly convention hall,' permitted plaintiffs to introduce evidence showing that since 1908 defendant had received as hire for the two booths, one in the northwest corner and one in the northeast corner of the building, the combined area of which was 1,582 square feet as compared with an area of 17,446 square feet in the hall proper, the sum of $1,461; that for certain booths and rooms erected at the ocean-end of the pier extending more than one thousand feet beyond the assembly hall building, the city had received several thousand dollars revenue for rent thereof, and the sum of two thousand dollars for a franchise or permit issued to a bathhouse company to construct and maintain a pipe-line along the pier by means whereof to obtain water for its bathhouse, besides receipts of other revenues from the use of the pier and wharf. In admitting such evidence the trial court committed prejudicial error. In our opinion, the pier and wharf and booths at the end thereof were no part of the assembly hall building, but entirely distinct and separate therefrom, as much so, indeed, as though the approach or way

covering the intervening space between the pier and entrance to the hall had never been constructed. Hence, the rental received from this pier and wharf could not be deemed revenue derived from the letting of the assembly hall for hire.

"We perceive no reason why a municipality having a city hall building erected solely for public uses, may not let rooms therein which are not immediately required for such public use, as to which it would occupy the position of a corporate proprietor and as such, like a private owner, be liable for damages sustained by reason of its negligence in connection therewith. 'When a city or town does not devote such building [public hall] exclusively to municipal uses, but lets it or a part of it for its own advantage and emolument by receiving rents or otherwise, it is liable while it is so let in the same manner as a private owner would be.' (*Worden* v. *City of New Bedford,* 131 Mass. 23, [41 Am. Rep. 185] ; *Little* v. *City of Holyoke,* 177 Mass. 114, [52 L. R. A. 417, 58 N. E. 170] ; *Chicago* v. *Selz etc. Co.,* 202 Ill. 545, [67 N. E. 386] ; *Davis* v. *Rockport,* 213 Mass. 279, [43 L. R. A. (N. S.) 1139, 100 N. E. 612].) This being true, the letting for hire of these two small booths, disconnected as they were from the assembly hall, as to which defendant's character was that of a private owner, did not fix or affect its character or function in the maintenance of the assembly hall. They were no part of the hall and, like the wharf, the rental received for the use thereof was not for the letting of the hall for hire. Hence, it follows that the ruling of the court in admitting evidence of the letting of these two booths was likewise erroneous.

"Not only was there no evidence of the letting of the assembly hall by the city or its officers, but there was no evidence, nor is there any claim or pretense, that any rental was exacted or paid for such use upon the occasion of the accident wherein Edith Chafor lost her life.

"The building or structure abutted a street on the easterly side thereof from which the hall could be reached by a stairway leading to the entrance of the building. The building was a two-story structure, the lower floor being uninclosed and at all times open to anyone desiring to go there. The second floor upon which the assembly hall was located was surrounded by an open and covered balcony eleven feet wide, furnished with seats, and open at all times to the general public, the use of which and the lower floor may be likened

CLXXIV Cal.—32

to the use of a public city park. It thus appears that the building was not only designed and constructed for a double use, but that in the conduct and maintenance thereof the city has in part used it in its private corporate capacity in letting for hire the two small booths referred to; that it has used a part thereof, to wit, the balconies and lower floor, at all times in its governmental capacity, like a public park, and that, with the exception of one occasion, in March, 1910, has used the assembly hall at all times without profit, gain, or emolument for the benefit of the general public.

"If correct in our conclusion that the maintenance and use of the hall was not impressed with an exclusive proprietary character, but that the character of the use on the occasion in question must be determined from evidence showing a letting of the hall for private use for hire, as to which the record is wholly silent, it necessarily follows that the court committed highly prejudicial error in, of its own motion, instructing the jury that 'the construction, erection, and maintenance of the auditorium building by the city of Long Beach was an act of said city in the exercise of its proprietary or private capacity, and the measure of its responsibility or liability in relation thereto is the same as that of any other individual or private corporation engaged in similar conduct, and no more or no less.' "

For the foregoing reasons I am of the opinion that the judgment should be reversed.

Angellotti, C. J., concurred.

Rehearing denied.