[Civ. No. 13382. First Dist., Div. One. Feb. 6, 1948.]

MACK MUSES et al., Appellants, v. HOUSING AUTHORITY OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

Edward D. Mabson for Appellants.

William A. O'Brien for Respondents.

WARD, J.—This is an appeal from a judgment sustaining a demurrer without leave to amend. The complaint is entitled "Complaint for Damages and Claim and Delivery" and alleges that the Housing Authority of the City and County of San Francisco is a public body politic.

The demurrer interposed particularly raises the question of the jurisdiction of the persons and the subject of the action. The purpose of the demurrer was to raise the question of the liability, if any, of this agency for tort. Added thereto are other grounds more or less special in their nature which need not be considered here. If defendant's contention that the court has no jurisdiction is correct the matter is at an end. If plaintiffs have a right to maintain an action against defendant corporation, then it was error to sustain the demurrer without leave to amend. The questions, including the title to the personal property and matters akin thereto and other allegations that may be subject to special demurrer, may be disposed of in the trial court.

Defendant answers the contention that it is liable for tort as follows: "That it is the law of this state under the decision in *People* v. *Superior Court* [29 Cal.2d 754 (178 P.2d 1)] that where the state engaged in 'industrial' or 'business' enterprises, as distinguished from purely governmental activities, tort liability will attach, we concede.

"That Respondent, while exercising its function, under the California Authorities Law and the California War Housing Law, was engaged in an 'industrial' or 'business' enterprise, we deny."

The admission heretofore noted by defendant needs elucidation as a matter of demonstrating the error in the denial that accompanies the concession as applied to the demurrer and the ruling thereon in this case.

In *Housing Authority* v. *Dockweiler*, 14 Cal.2d 437 [94 P.2d 794], dealing with slum clearance, it was said (p. 449): "It must be admitted that the questions involved in this litigation are of great public concern and importance. While there are a number of issues presented, the one of fundamental importance, and upon the determination of which several of the lesser and incidental issues will turn, is whether slum clearance and public housing projects for low-income families are public uses and purposes for which public money may be expended and private property acquired. Primarily, it should be recalled that the federal statute and our state statutes are premised upon the expressly declared policy that elimination of substandard dwellings and the providing in their place and stead of safe and sanitary dwellings of low rental for those otherwise required by lack of income to remain in the substandard dwellings are public uses and purposes and are governmental functions of state concern."

The welfare purpose of this act may be considered separate and apart from its business activities if the latter constitutes competition with industry or labor. The welfare feature may continue without denying the beneficiary the right to claim damages for a legal injury.

To determine the correctness of the order sustaining the grounds of the demurrer this court is called upon to study (1) the present and previous statutes, (2) the allegations of the complaint as it stands, and (3) the possibility of amendment of the complaint to bring it within the law.

The question whether public corporations engaged in purely governmental activities are immune from tort liability is

gradually simmering down from a boiling point reached by two extreme lines of thought, one, by those who believe that the state itself in its corporate entity acts as a sovereignty in all respects, and the other by those who believe that sovereignty is a cloak that should be torn from the invisible form of the public corporation representing the state, and that it should be regarded as any incorporated body, enjoying like privileges and subject to like obligations. The purpose of government is the benefit, protection and security of the people. (Const. of Cal., art. I, § 2.) To attain this purpose it must assume a position of authority.

Over a long period it was held that the distinction between governmental and proprietary acts does not apply to the state or to state agencies; that practically all sovereign immunity continues and that the activities of state agencies should be classified as governmental in character. However, "Municipal and quasi-municipal corporations, such as *cities* and *municipal utility districts,* are not considered purely state agencies, and their functions are not exclusively governmental. Hence the general rule applicable to them is that they are liable for the torts of their agents committed while acting in a *proprietary capacity* and not while acting in a *governmental capacity.* The capacity in which they act at the time of the tort determines the liability." (Witkin's Summary of California Law, (6th ed.) vol. 1, § 26 p. 643.) The same volume states (p. 644) : "The following are among municipal activities which have been held to be proprietary: Water, gas and electric systems (*Davoust* v. *Alameda* (1906) 149 C. 69, 84 P. 760 [9 Ann.Cas. 847, 5 L.R.A.N.S. 536]) ; municipal auditorium (*Chafor* v. *Long Beach* (1917) 174 C. 478, 163 P. 670 [Ann.Cas. 1918D 106, L.R.A. 1917E 685]) ; garage for repair of city automobiles (*Bertiz* v. *Los Angeles* (1925) 74 C.A. 792, 241 P. 921) ; municipal airport (*Coleman* v. *Oakland* (1930) 110 C.A. 715, 295 P. 59; *General Pet. Corp.* v. *Los Angeles* (1937) 22 C.A.2d 332, 70 P.2d 998 [furnishing municipally employed harbor pilots] ; see 14 Cal. L.Rev. 229; 3 So.Cal.L.Rev. 353.) "

*Morrison* v. *Smith Bros., Inc.,* 211 Cal. 36 [293 P. 53] (consolidated with other cases) is a case involving damages for the alleged wrongful death of a certain named person. The district in which the accident happened had been organized under and pursuant to the Municipal Utility District Act. (Stats. 1921, p. 245; 2 Deering's Gen. Laws, Act 6393.)

While referred to as a "municipal" act, it was in fact an act empowering one county to enter into a contract with another to maintain ferries across streams, and empowering one county, in the event the second county refused, to enter into a county to acquire landing places on the opposite boundary. The defendant municipal district demurred generally and the trial court sustained the demurrers. The question in dispute was stated to be "that the respondent district, like the municipality, is liable to suit when injury results from the negligence of its officers or agents exercising powers in reference to matters not purely governmental but of a proprietary character. Respondent, on the other hand, urges that it is to be dealt with as an agency of the state, that is, as a separate and distinct governmental entity whose purposes, activities and functions are necessarily public or governmental in character. Respondent concedes that incorporated cities and towns have been held liable in tort and have been held to be acting in a proprietary character when engaged in activities similar to those designated by the statute under which it was formed, but argues that this does not in any sense make the same activities proprietary when engaged in by a corporation such as it declares itself to be." In the Morrison case the court said (pp. 39-40, 44-45) : "Within the general class of public corporations, this court has already distinguished between two different species of such corporations, as far as liability for tort is concerned. On the one hand there are incorporated cities and towns, usually referred to as municipal corporations. In reference to this type of public corporation the rule is well settled that their liability for tort depends on the nature of the work being done at the time the tort is committed. If the agents were acting in a governmental capacity no liability attaches to the corporation, under the elementary rule that the state or its various subdivisions are not liable for the torts of their agents while acting in a governmental capacity. But it is equally well settled that an incorporated city or town is liable for the torts of its agents committed while acting in a proprietary capacity. . . .

"The other type of public corporation upon whose tort liability this court has already passed is typified by irrigation, reclamation or drainage organizations, whose main purpose is to assist the state in reclaiming, improving and aiding the productivity of farm lands. In reference to this type of organization the law is well settled that, subject to certain

exceptions not important in this case, they are not liable for the torts of their agents, upon the theory that they are state agencies, performing a governmental function. . . .

"We feel that sufficient has been said to show that such *quasi*-municipal corporations as respondent more closely resemble municipal corporations proper than they do state agencies, such as irrigation and reclamation districts. Under such circumstances we deem the better rule to be that, so far as tort liability is concerned, such liability is to be governed by the same rules as are applicable to municipal corporations proper. No good reason occurs to us why those districts should be cloaked with the immunity that respondent claims when acting in a purely proprietary capacity; and, in fact, many reasons exist why the same rule that applies to municipal corporations proper should apply to respondent. It would certainly be an anomalous situation if a municipality engaged in a proprietary function, such as running, operating or constructing waterworks, would be liable for the torts of its agents, but if that same municipality should join with other municipalities and organize a municipal utility district it would thereby immunize itself from all such liability. Such a rule does not appeal to our sense of justice nor to our reason. The rule excluding state agencies from liability for tort is an exception to the general rule which we are not inclined to extend. In so far as liability for tort is concerned, the respondent district is to be governed by the same rules as govern municipal corporations with reference to the same question—that is, respondent is liable for the torts of its agents if said torts are committed while the agents are acting in a proprietary capacity."

There are cases that do not agree with *Morrison* v. *Smith Bros., Inc., supra,* or, on slightly different facts, have adhered to the strict doctrine of sovereign immunity. *Rauschan* v. *State Comp. Ins. Fund,* 80 Cal.App 754 [253 P. 173], decided prior to the Morrison case, held that the State Compensation Insurance Fund was immune. Subsequently a county hospital operated without profit was declared to be immune. (*Calkins* v. *Newton,* 36 Cal.App.2d 262 [97 P.2d 523].) To the same effect, see *Griffin* v. *County of Colusa,* 44 Cal.App.2d 915 [113 P.2d 270] and cases cited therein.

However, *Yolo* v. *Modesto Irr. Dist.,* 216 Cal. 274 [13 P.2d 908] was an appeal from a judgment of nonsuit in a tort action. The court commented as follows (pp. 276-277):

"Preliminarily it may be said that in numerous cases dealing with tort liability, this court has distinguished between two species of public corporations. In the one class have been placed incorporated cities, towns and similar organizations, denominated 'municipal corporations,' which may be held liable for torts of their agents committed while acting in a proprietary capacity. (*Chafor* v. *Long Beach*, 174 Cal. 478 [Ann.Cas. 1918D, 106, L.R.A. 1917E, 685, 163 P. 670]; *Davoust* v. *City of Alameda*, 149 Cal. 69 [9 Ann.Cas. 847, 5 L.R.A.N.S. 536, 84 P. 760]; *Morrison* v. *Smith Bros.*, 211 Cal. 36 [293 P. 53].) In the other class have been placed irrigation, reclamation, drainage and similar organizations, variously denominated 'public corporations,' for 'governmental purposes,' 'agents or representatives of the state in the particular locality in which they exist,' 'public agencies,' etc., which (with certain exceptions such as liability created by statute) are not generally liable for torts of their agents because they are held to be state agencies performing governmental functions. (*Whitman* v. *Anderson-Cottonwood Irr. Dist.*, 60 Cal.App. 234 [212 P. 706]; *Nissen* v. *Cordua Irr. Dist.*, 204 Cal. 542 [269 P. 171]; *Morrison* v. *Smith Bros.*, *supra.*) The case last cited also recognizes a third classification, corporations such as a district organized under the Municipal Utility District Act (Stats. 1921, p. 245), denominated '*quasi*-municipal corporations' or public corporations of a *quasi*-municipal character, more nearly resembling municipal corporations proper than state agencies and subject, so far as liability for tort is concerned, to the rules governing municipal corporations, that is, being generally liable for torts committed by their agents while acting in a proprietary capacity." The Modesto Irrigation District was primarily created and operated as an irrigation district to perform governmental functions, but subsequently, by amendments to the original statute, it was permitted to manufacture and distribute electric power, light and energy, thereby (p. 277) "competing with a public service corporation." A broken wire used in its business of transmitting power caused the accident which resulted in the tort action. The court held (pp. 279-280): "The inhabitants of Modesto and outlying districts desired to operate an electrical distribution system under public ownership. Had this end been accomplished through the city itself, a municipal corporation, it would have been liable for all torts committed by it in conducting such a pro-

prietary enterprise (*Davoust* v. *City of Alameda, supra; Ruppe* v. *City of Los Angeles,* 186 Cal. 400 [199 P. 496]; *Sincerney* v. *City of Los Angeles,* 53 Cal.App. 440 [200 P. 380]); had it been accomplished through a public utility district, such district might also have been liable. (*In re Orosi Public Utility District,* 196 Cal. 43 [235 P.1004]); the same is true of a municipal utility district (*Morrison* v. *Smith Bros., supra*).''

■ The trend, legislatively by enactment of statutes and judicially by construction of statutes, has been to permit persons who have valid claims against the state to bring suit under certain circumstances, subject to the statute of limitations and other specified conditions, in a court of competent jurisdiction to determine the justice of the claim to the end and purpose of final judgment. (Stats. 1893, ch. 45.) Statutes of 1929 added new sections to the Political Code which by substitution became a part of Government Code, section 16041 (Stats. 1945, ch. 119, p. 511) which provides: ''Any person who has a claim against the State (1) on express contract, (2) for negligence, or (3) for the taking or damaging of private property for public use within the meaning of Section 14 of Article I of the Constitution, shall present the claim to the board in accordance with Section 16021. If the claim is rejected or disallowed by the board, the claimant may bring an action against the State on the claim and prosecute it to final judgment, subject to the conditions prescribed by this chapter.'' Section 16021 provides the time and the manner of presenting claims.

Having reached the conclusion that the action herein may not be prohibited by law, it becomes necessary to examine the present act and other legislation bearing upon the general subject in order to answer the question disputed by the respective parties, and perhaps later examine the pleadings.

■ At the outset it may be well to observe that a state may donate or sell its land to the United States government, or the latter may, by condemnation proceedings, acquire state land and devote it to federal purposes without withdrawing such land from the jurisdiction of the state. The respective governments may enter into mutual agreements on the question of jurisdiction relative to such acquired land. (*Collins* v. *Yosemite Park Co.,* 304 U.S. 518 [58 S.Ct. 1009, 82 L.Ed. 1502].)

■ Plaintiff stresses the point that the Housing Author-

ities Law (Stats. Ex. Sess., 1938, p. 9; 2 Deering's Cal. Gen. Laws, Act 3483, p. 1297, § 8) provides: "An authority shall constitute a public body corporate and politic, exercising public and essential governmental functions, and having all the powers necessary or convenient to carry out and effectuate the purpose and provisions of this act, including the following powers in addition to others herein granted: (a) To sue and be sued." The provision in a statute creating a corporate agency that it may "sue and be sued" in and of itself does not create a liability against the state where none existed before. Whether sovereign immunity has been bestowed upon the state or upon a state agency is purely a jurisdictional question. In *People* v. *Superior Court,* 29 Cal.2d 754 [178 P.2d 1], this question, after consideration of leading cases on the subject, was disposed of (p. 759) as follows: "Thus there was adopted in this state the doctrine that state consent to be sued for negligence did not waive sovereign immunity from liability for tort." It is unnecessary to consider the cases cited in *People* v. *Superior Court, supra.*

The legislative history of state housing acts is interesting and throws light on the general purpose of housing plans, limited dividend housing corporations (Stats. 1933 p. 1426; 2 Deering's Cal. Gen. Laws, Act 3481), and community land and chest acts (Stats. 1933, p. 1465; 2 Deering's Cal. Gen. Laws, Act 3482), when considered with later housing authority.

The division of immigration and housing (Stats. 1921, ch. 604, as subsequently amended by Stats. 1927, ch. 440 and Stats. 1931, ch. 978), is a part of the same legislative enactment developing a general scheme of industrial relations and welfare. Industry is made a part of the foundation upon which the War Housing Law is built. The props used as support were loaned or donated by the federal and state governments.

The Limited Dividend Housing Corporations Act, *supra,* provided: "The term 'actual cost' includes in addition to the cost of the lands and buildings, charges for financing and supervision, and carrying charges during construction, including interest on borrowed money and invested capital, when such charges have been approved by the commission. . . .

"The term 'fixed charges' includes all operating and maintenance charges, taxes, assessments, insurance and de-

preciation, amortization, interest, sinking fund, and other expenses and charges in amounts approved by the commission. . . .

"The term 'security' shall include any share, stock, bond, note, treasury stock, debenture, evidence of indebtedness, certificate of interest or participation, or beneficial interest in title to property, profits or earnings or any other instrument commonly known as a security. . . .

"The term 'slum area' means any area of property partially or totally occupied by deteriorated, obsolete, unsafe or unsanitary single or multiple dwellings. The determination of the question as to whether or not any building is deteriorated, obsolete, unsafe or unsanitary rests solely with the commission. . . .

"The provisions of law as to corporations generally shall be applicable to corporations formed under this act, except where inconsistent with the corresponding provisions of this act, in which case the provisions of this act shall prevail. . . .

"The par value of all shares of capital stock of the corporation, and all shares must have a par value. . . .

"Any limited dividend housing corporation incorporated under this act shall have power and authority, when authorized by the commission: 1. To borrow money from or to sell, pledge or discount its securities to the Reconstruction Finance Corporation, Federal Home Loan Bank, or any other corporation or agency established under the authority of the United States Government. 2. To comply with the provisions for membership and to become a member of the Federal Home Loan Bank or of any other corporation or agency established under the authority of the United States Government and to comply with any provisions or regulations of the Reconstruction Finance Corporation." (Stats. 1933, p. 1426; 2 Deering's Cal. Gen. Laws, Act 3481, pp. 1279-1280.) Other provisions indicate as above that the state intended the creation of a permanent housing, building and maintenance corporation under reasonably protected restrictions. (Stats. 1933, p. 1429, § 8, subd. 3d.)

The Statutes of 1933, page 1465 [2 Deering's Gen. Laws, Act 3482] show the passage of the "Community Land Chest Act," which approved the organization of nonprofit corporations to provide housing in rural and suburban districts with the privilege (pp. 1466-1467, § 5, subds. 1, 2). "To borrow money from or to sell, pledge or discount its securities, or

to mortgage, pledge or otherwise hypothecate its property to the Reconstruction Finance Corporation, Federal Home Loan Bank, or any other corporation or agency established under the authority of the United States or of this State.

"2. To comply with the provisions for membership and to become a member of the Federal Home Loan Bank or of any other corporation or agency established under the authority of the United States or of this State and to comply with any provisions or regulations of the Reconstruction Finance Corporation." The purpose of aiding industry and business is apparent from the following (§ 21, p. 1472): "Since the building trades in the State of California are now dormant, it is of vital interest to the people of this State that corporations may be formed as provided in this act to take advantage of such proffered assistance to the end that such building trades be again revived and many thousands of people now unemployed be put to work."

It appears that one of the original purposes of the California Housing Authorities Law (Stats. 1938, Ex. Sess., ch. 4, p. 9; 2 Deering's Gen. Laws, 1945 Supp., Act 3483) was to effect slum clearance. "'Housing project' shall mean any work or undertaking to be financed in whole or in part by the Federal Government: (1) to demolish, clear or remove buildings from any slum area; such work or undertaking may embrace the adaptation of such area to public purposes, including parks or other recreational or community purposes; or (2) to provide decent, safe and sanitary urban or rural dwellings, apartments or other living accommodations for persons of low income; such work or undertaking may include buildings, land, equipment facilities and other real or personal property for necessary, convenient or desirable appurtenances, streets, sewers, water service, parks, site preparation, gardening, administrative, community, health, recreational, educational, welfare or other purposes; or (3) to accomplish a combination of the foregoing. The term 'housing project' also may be applied to the planning of the buildings and improvements, the acquisition of property, the demolition of existing structures, the construction, reconstruction, alteration and repair of the improvements and all other work in connection therewith." (Stats. 1938, Ex. Sess., ch. 4, § 3, subd. 1, pp. 11-12; 2 Deering's Gen. Laws, Act 3483, § 3, subd. 1, p. 1295.) The act was an outgrowth of United States Housing Act of 1937 (50 Stats. 888, 42 U.S.C.A., §§ 1401-

1430), which declared a policy to promote general welfare by remedying unsafe and unsanitary housing conditions. (*Housing Authority* v. *Dockweiler,* 14 Cal.2d 437 [94 P.2d 794].) The act has been added to several other acts as appears in 2 Deering's Gen. Laws, Act 3485; Stats. 1938, Ex. Sess., ch. 1, p. 1; 2 Deering's Gen. Laws, Act 3483; Stats. 1938, Ex. Sess., ch. 4, p. 9, Stats. 1939, ch. 301; 2 Deering's Gen. Laws, Act 3487; Stats. 1943, ch. 798, Stats. 1945, ch. 1021.

The permitted utility of the housing projects in various parts of the country, unless authorized by special act of Congress, grew out of the plan authorized in 1940 by the Lanham Act, Public Law No. 849, 76th Congress, Third Session, 54 Statutes at Large, 1125 [42 U.S.C.A., § 1521]. The general purpose of this and somewhat similar acts was national defense; the specific purpose was to provide housing for persons engaged in national defense activities, including workers in industries connected with and essential to national defense. (*Johnson* v. *Morrill,* 20 Cal.2d 446 [126 P.2d 873].) In the Johnson case it is said (p. 452) : ''Section 10 of the Lanham Act reads: 'Notwithstanding any other provision of law, the acquisition by the Administrator of any real property pursuant to this Act shall not deprive any State or political subdivision thereof of its civil or criminal jurisdiction in and over such property, or impair the civil rights under the State or local law of the inhabitants on such property.''

''. . . Notwithstanding the fact that the United States may acquire exclusive jurisdiction over such defense housing projects, exclusive jurisdiction is not to be deemed to be created by pursuing the authority vested by this act.''

The 1943 act to aid the prosecution of the war (Stats. 1943, ch. 798, § 2, p. 2590), which provided for the housing of persons engaged in war industries or activities set forth: ''For the purpose of developing or administering War Housing Projects to aid in the prosecution of the war, any housing authority established and authorized to transact business on or before March 1, 1943, pursuant to Chapter 4 of the Statutes of 1938, Extra Session, as amended (herein called the 'Housing Authorities Law') may cooperate with, act as agent for, or lease such War Housing Project from, the Federal Government; provided, that a War Housing Project owned, leased, or administered under this act by a housing authority shall not be subject to the limitations provided in Section 10 or in the second sentence of Section 9 of the Housing Authori-

ties Law.'' The noted sections do not affect this controversy. It may be noticed that housing authority previous acts are applicable except as above stated. The limitation therein does not preclude suit by or against the state agency.

The last-mentioned statute (Stats. 1943, ch. 798) was amended several times by the Legislature in 1945. The only amendment that appears to be pertinent hereto is Statutes 1945, chapter 433, page 922, where it refers to the power to ''transact business.'' ''Housing project'' is declared (p. 923) to apply to ''the planning of the buildings and improvements, the acquisition of property, the demolition of existing structures, the construction, reconstruction, alteration and repair of the improvements and all other work in connection therewith.'' In chapter 431, page 919, it is said that in any suit relating to any contract of the authority ''the authority shall be conclusively deemed to have become established and authorized to *transact business* and exercise its powers hereunder upon proof of the adoption of a. resolution by the governing body declaring the need for the authority.'' (Emphasis added.) Chapter 766, Statutes 1945 provides, as in previous enactments, for leasing, selling and transferring property and (p. 1451) ''To arrange or contract for the furnishing by any person or agency, public or private, of services, privileges, works, or facilities for, or in connection with, a housing project or the occupants thereof.''

There is attached to the brief for respondent a copy of an amendment to the ''War Housing Law.'' Therein it is provided that *''any housing authority* . . . authorized to *transact business''* may act as agent for, or lease such War Housing Project, owned, leased or administered under the act by a housing authority. (Second emphasis added.) Under previous acts the housing authority is authorized to conduct an industrial enterprise and transact business. In the same year, to say nothing of previous years, the corporate housing agency was permitted to sell and transfer property (Stats. 1945, ch. 766) and transact business (Stats. 1945, ch. 433). The provisions of law as to corporations generally are applicable to corporations formed under the present act.

*People* v. *Superior Court, supra,* pages 761-762, contains a discussion of the leading cases on the subject of the liability of the state for damages based upon the negligent acts of its representatives. ''With the possible exception of *Rauschan* v. *State Comp. Ins. Fund, supra* (80 Cal.App. 754),

which followed *Riddoch* v. *State, supra* (68 Wash. 329 [123 P. 450, Ann.Cas. 1913E 1033, 42 L.R.A.N.S. 251]), the decisions in this state do not foreclose, but seem to favor the proposition that sovereign liability exists for negligence in the state operation of an industrial or business enterprise. Therefore, pursuant to those decisions headed by the case of *Green* v. *State, supra* (73 Cal. 29 [11 P. 602, 14 P. 610]), it should be concluded that where the state engages in industrial or business enterprises, as distinguished from purely governmental activities, tort liability attaches and may be adjudicated pursuant to the consent statute. Insofar as the decision in *Rauschan* v. *State Comp. Ins. Fund, supra* (80 Cal.App. 754), is not in harmony with the conclusion herein, it is disapproved." In *Manney* v. *Housing Authority* (see 2 Deering's Cal. Gen. Laws, Act 3483), 79 Cal.App.2d 453, 457, 464 [180 P.2d 69], it is said: "In the operation of this dormitory it was engaged in a proprietary and not a governmental function. Any doubt which might have existed as to its liability to suit for negligence while acting in a proprietary capacity has been resolved in *People* v. *Superior Court*, 29 Cal.2d 754 [178 P.2d 1]. Cf. *Housing Authority of Birmingham Dist.* v. *Morris*, 244 Ala. 557 [14 So.2d 527, 535]." "The fact that the dormitories were built by a federal agency would not excuse appellant from attempting to remedy a dangerous fire hazard in the dormitories after it was operating them, if one existed."

The state, to the extent that it must remain within its realm of power, protecting the benefits as originally intended, is sovereign, but when it steps out from its all supreme position as ruler and competes with industry or labor, then, so far as tort liability is concerned, it must be held to be acting in a proprietary capacity and be subject to the same liability for its torts as private parties.

The fact that the intention of the act is that it shall be administered without profit is beside the point. The state through its agency has entered the commercial field. Having created and operated a business enterprise it is liable for a tort. The trial court is authorized under the terms of the statute to pass upon the merits of the case if the complaint shows jurisdiction of the subject matter and the balance of the complaint may be amended to state a cause of action against the persons involved in their official capacities.

The complaint alleges that defendant corporation was

created and existed under the laws of the State of California; that it transacted business and exercised its power under said laws, having its principal place of business in the City and County of San Francisco within the said state; that it is the owner and in complete control and management of a certain housing project at Hunters Point in San Francisco.

Plaintiffs rented a certain dwelling house or living quarters from defendant corporation upon a written lease at a monthly rental of $41, paid the required deposit of $10, entered into possession "and lived there continuously thereafter paying the rent each month" for several months. In October, 1945, it is alleged "while he [plaintiff] was at work, without legal written notice, or any notice whatsoever of termination of tenancy, unlawfully, without right and contrary to statute in such case made and provided, and, in violation of the Office of Price Administration Rent Regulation for Housing as provided in the Emergency Price Control Act as amended in 1942, governing the removal of tenants, take possession of said premises, evict plaintiffs therefrom, and did wilfully, wrongfully without plaintiffs' knowledge or consent, remove from said premises each, all and every article of plaintiffs' personal property and effects, to the value of Five Hundred Twenty-Nine and 8/100 ($529.08) Dollars, consisting of clothing, shoes, dishes, radio, jewelry, blankets, bed linen, a watch, hand luggage, bed spreads and private papers and documents, and did lock the doors of said premises, thereby wrongfully excluding said plaintiff from access to said premises, depriving him of a place to sleep and rest after his day's work, and by reason of present shortage of housing accommodations said plaintiff was, as a result of defendants aforesaid wrongful acts, compelled to and did walk the streets all that night, and for the following week said plaintiff slept in a garage where he had been formerly employed." It is also alleged that on the day following the eviction defendant still had in its possession the original $10 deposit; that on the day following the eviction one of the plaintiffs, Mack Muses, demanded the immediate return of his property and private papers and was informed that the property was held to secure payment of $10.74; that plaintiff Mack Muses paid the amount but defendant failed and refused to surrender the property. Plaintiffs allege that defendant stated that the property and papers "were no longer in its possession and therefore could

not be returned to plaintiff.'' There is an allegation of damage and special damages in stated amounts, and a prayer therefor.

It must be determined that the pleading sufficiently alleges that the California Authorities Law as mentioned by respondent, or the California Housing Authorities Law, or the California War Housing Law, though all may not be specifically named, are the basic laws upon which the alleged wrong was grounded. The complaint should be amended and, if necessary, a demurrer filed.

In accordance with the views herein expressed it was error for the trial court to have sustained the demurrer without leave to amend. The judgment appealed from is reversed.

Peters, P. J., and Bray, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied April 1, 1948. Edmonds, J., voted for a hearing.