[Civ. No. 637. Fourth Appellate District.—December 5, 1932.]

L. E. PITTAM, Respondent, v. CITY OF RIVERSIDE (a Municipal Corporation), Appellant.

Eugene Best, City Attorney, for Appellant.

Estudillo & Schwinn for Respondent.

MARKS, J.—This is an action for damages for loss of bees and apiary equipment destroyed by fire which plaintiff alleges escaped from the dumping ground of the City of Riverside. A verdict was rendered in favor of plaintiff and judgment entered in the sum of $1328.70, from which defendant appeals.

The City of Riverside, a municipal corporation organized and existing under a freeholders' charter, owned a sizeable tract of land which it used as a dumping and burning ground for trash and garbage collected from within the city. Respondent owned a small tract of land upon which he lived and operated an apiary. The northerly boundary of his property was about 1,000 feet southerly from the city dump. At occasional periods of the year winds of varying intensity blow from the north to the south in that locality.

At the time of the fire which consumed respondent's property the city maintained what the witnesses referred to as a burning area near the center of its property. The southern end of this area was about 550 feet from the southerly line of the city property. It was surrounded with trees and lay along a small watercourse and was below the level of the adjacent property. It was about 550 feet in length and had a maximum width of about fifty feet. The area between the properties of the city and of respondent was level and was covered with a growth of salt grass and small bushes.

The City of Riverside had owned its property for about thirty-five years and had used portions of it as a garbage, trash and other refuse disposal ground for many years. In

the summer of 1929 a number of the residents of the district, including respondent, complained to the city council of the City of Riverside that its dumping ground constituted a menace to health and was a fire hazard. About six months thereafter the city employed a resident caretaker, moved its burning area to a place more nearly in the center of its property and otherwise sought to improve the conditions prevailing there.

At about 2 o'clock in the afternoon of January 19, 1931, at a time when a strong wind from the north was blowing, respondent saw a fire burning in the salt grass just south of the city property and nearly 1,000 feet northerly from his apiary. It was blown south rapidly and consumed the personal property for which he obtained judgment.

This action was brought under the provisions of section 2 of an act of the legislature approved June 13, 1923 (Stats. 1923, p. 675). Under this section of the act municipalities are made liable for injuries to property resulting from the dangerous or defective condition of public "grounds, works and property in all cases where the governing or managing board . . . or person having authority to remedy such condition, had knowledge or notice of the defective or dangerous condition of any such . . . grounds, works or property and failed or neglected, for a reasonable time after acquiring such knowledge or receiving such notice, to remedy such condition or failed and neglected for a reasonable time after acquiring such knowledge or receiving such notice to take such action as may be reasonably necessary to protect the public against such dangerous or defective condition". It is not questioned that the city council of the City of Riverside was the governing body of that municipality with authority to remedy any condition existing at the dumping ground.

Under the provision of that portion of section 2 of the act, which we have quoted, the following conditions must exist to support the judgment of the court below: (1) The injuries to respondent through the destruction of his personal property must have resulted from a dangerous or defective condition of the dumping ground; (2) the city council of the City of Riverside, or some officer or person having authority to remedy such condition, must have had notice or knowledge thereof; (3) it, or he, must have failed

or neglected to remedy such dangerous or defective condition within a reasonable time after acquiring such knowledge or receiving such notice; or, (4) must have failed to take such action as might be reasonably necessary to protect the public against such dangerous or defective condition within a reasonable time after such knowledge or notice.

Appellant presents the following grounds upon which it relies for a reversal of the judgment: That the trial court erred in denying its motion to strike certain portions of the complaint; that the trial court erred in denying its motion for an instruction directing the jury to return a verdict in its favor; that there was no evidence of a dangerous or defective condition of the dumping grounds; that there was no evidence of notice to or knowledge of the City of Riverside of a defective or dangerous condition, if one existed; that the trial court misdirected the jury on questions of law; and that respondent was guilty of contributory negligence as a matter of law.

Appellant moved to strike out the emphasized words in the following quotations from the complaint: "That defendant on said 19th day of January, 1931, wrongfully, dangerously, defectively *and negligently* maintained, *operated, managed* and owned a City Dump . . . That by reason of the wrongful, dangerous, defective *and negligent* maintenance, *operation, management,* and ownership of said City Dump." The questions presented by the motion to strike must be considered elsewhere and need not be separately reviewed here.

The argument in support of the contention that the motion for an instructed verdict should have been granted is involved in a discussion of the third and fourth specifications of error, so that this question need not be separately considered.

We must approach a consideration of the questions presented by this appeal with the well-settled rule of common law in mind that a municipal corporation in the exercise of its governmental functions was not liable for damage resulting from the negligence of its officers, agents or employees in the exercise of these governmental functions. As was said in *Coleman* v. *City of Oakland,* 110 Cal. App. 715 [295 Pac. 59, 60]: "Appellant seeks to hold the City of Oakland under the common law liability imposed upon a

municipal corporation when it is acting in a proprietary, as distinguished from a governmental, capacity. The general distinctions between the two functions of a city is thus stated in *Chafor* v. *City of Long Beach,* 174 Cal. 478, 487, 488 (163 Pac. 670, Ann. Cas. 1918D, 106, L. R. A. 1917E, 685): 'Under the theory of the common law, that the municipality is protected from liability only while exercising the delegated functions of sovereignty, the governmental powers of a city are those pertaining to the making and enforcing of police regulations, to prevent crime, to preserve the public health, to prevent fires, the caring for the poor and the education of the young; and in the performance of these functions all buildings and instrumentalities connected therewith come under the application of the principle. (*City of Kokomo* v. *Loy,* 185 Ind. 18 [112 N. E. 994].)' "

█ It is only where statutes give a right of action that an action can be maintained to recover damages inflicted by a city in the exercise of its governmental functions. (*Kellar* v. *City of Los Angeles,* 179 Cal. 605 [178 Pac. 505]; *Miller* v. *City of Palo Alto,* 208 Cal. 74 [280 Pac. 108, 109].)

Where the exercise of a governmental function is involved, and under such facts as are here presented, the right to maintain an action against a municipality is conferred by the act approved June 13, 1923, *supra,* and a person suffering injury can only recover against a city when the right to sue has been conferred upon him by this act. He should confine his pleadings and his evidence to the right of action there given him. Section 1 of this act makes certain municipal officers liable for negligence of employees under conditions there specified. We are not concerned with this liability for negligence of employees because the complaint does not attempt to state a cause of action under this section. If the judgment is to be sustained this must be accomplished under the provisions of section 2 of the act from which we have already quoted.

Respondent has devoted a considerable portion of his brief to arguing the question of the liability of the city for general negligence in the operation of the dumping ground. It seems to be his theory from the allegations of his complaint, his conduct of the case during the trial, and the instructions prepared by him and given at his request, that the rules of general negligence governing actions between

individuals govern here and will support the judgment. On the other hand it is the theory of appellant that negligence has nothing to do with the action and that its rules cannot be invoked to support the judgment. There is some truth, but much error, in both contentions. Negligence does not enter into the case except in so far as it is injected into it by the statute.

Under the pleadings and facts of the instant case the liability of the municipality in the exercise of a governmental function is limited to "injuries to persons and property resulting from the dangerous or defective condition of public . . . grounds, works and property". Knowingly maintaining public property in such a condition that it is dangerous to the life, limb, health or safety of the person or property of another, or the operation of municipal works upon its own property in accordance with a general scheme put in effect by municipal authorities, in such a manner that like dangers would exist, is a form of negligence. This is the doing of something in a manner in which an ordinarily prudent person would not do it. Permitting property to remain in a dangerous or defective condition after notice, without remedying such condition or taking such action as might be reasonably necessary to protect others from injury, is also a form of negligence. This is the failure to do what a reasonably prudent person should do under like circumstances. In these respects this action involves negligence.

It is well established that the disposal of garbage by a city is the exercise of a governmental function. (*Miller* v. *City of Palo Alto, supra; Manning* v. *City of Pasadena,* 58 Cal. App. 666 [209 Pac. 253].) The municipality derives the right to provide for garbage disposal from its sovereign powers of preserving the public health. (*In re City and County of San Francisco,* 191 Cal. 172 [215 Pac. 549]; 13 Cal. Jur. 291.) The same power gives to the city the right to prevent the destruction of the property of its citizens by fire. (*Coleman* v. *City of Oakland, supra.*) The collection and disposal of waste materials which constitute a fire hazard should be just as much a governmental function as the collection and disposal of garbage which is a menace to health. (*In re Pedrosian,* 124 Cal. App. 692 [13 Pac. (2d) 389].) We can see no escape from the conclusion that the City of Riverside, in collecting garbage,

trash and other similar refuse matters, hauling them to its dumping ground and disposing of them by fire, was exercising a governmental function which ''is not completed until the ashes are disposed of''. (*Miller* v. *City of Palo Alto, supra.*)

■ Appellant urges with sincerity that there is no evidence of a dangerous or defective condition existing at the dumping ground. The jury has resolved all conflicts in the evidence in favor of respondent. We need particularize only the conflicting evidence favorable to respondent, and only evidence undisputed, either by direct or circumstantial evidence, inferences or presumptions.

We will have occasion to give various distances and measurements in this opinion. They will be taken from our scalings of the map of the area in question as more accurate than some of the estimates of witnesses which were given without any definite measurements or close observation.

The evidence discloses that on January 17, 18 and 19, 1931, a strong wind from the north was blowing over the city dumping ground, so that any burning embers arising there would be carried in the direction of respondent's property. At about 2 o'clock in the afternoon of January 19th, respondent was working at his apiary. A fire was burning on the city dumping ground, and had been for two previous days, the flames at times extending a number of feet in the air. There were no other fires burning in the neighborhood. At about 2 o'clock respondent saw a fire burning in the salt grass a few feet south from the south boundary of the city dumping ground and about 1,000 feet north of his property. The wind spread the fire so that between ten and twenty minutes thereafter it had reached the apiary and set it on fire. Respondent testified that the fire burning on the city dumping ground was about 150 feet north of its south boundary and about 400 feet south of the southerly end of the burning area. None of the witnesses located this fire within the burning area.

The caretaker testified that he burned garbage and rubbish in the burning area on January 17th, that the flames died down before 6 o'clock on that evening; that there was nothing dumped on the grounds on the 18th, and that there was a little smoke but no fire on that day; that on Monday morning, the 19th, ''when I came back there was

some fish heads and fish hides and chicken entrails, like that, that hadn't been burned up and were smoking a little bit; and that is all the fire I had''; that no fire was lit on the 19th until about 4 o'clock P. M.; that he did not see the large fire described by respondent and located by him about 400 feet south of the burning area.

Under the rule that the jury is the judge of the weight and sufficiency of the evidence and the credibility of the witnesses, we must take it as an established fact that the fire described by respondent was burning on the 17th, 18th and 19th of January at the place on the dumping ground where he located it. The evidence of the caretaker as to the condition of the fire on the dumping ground is undisputed except as to the fire seen by respondent. The caretaker is strongly corroborated by Fred Weist, a witness for respondent, who testified that he walked over the dumping ground between 11 and 12 o'clock on the morning of Sunday, January 18, 1931. He saw no blaze or fire, but perhaps a little smoke in the regular burning area. He did see a fire at about the place designated by respondent. He described this fire as about twenty-five feet long and three feet wide with a blaze about three or four feet high rising from it. It was tended by two men whom he neither knew nor identified.

There is rather positive evidence on behalf of the city that prior to April, 1930, garbage and trash were dumped and burned at various convenient places on the dumping ground, but that about the middle of April the city put into operation a definite new policy governing dumping and burning. The burning area was established at the place already described and all dumping and burning at other places prohibited. The gates through which the grounds were entered were kept locked. However, some trouble was experienced by trespassers entering, dumping and burning rubbish. In one instance a lock on one of the gates was stolen. This evidence is contradicted only by that of respondent, who testified that the change in the burning area was not made until after his fire on January 19, 1931. This testimony of respondent is contradicted by that of his own witness, Fred Weist, who testified that during his walk over the dumping ground on January 18th the burning area was in the place described by the witnesses for the city. It does not appear

that respondent had been on the dumping ground after April 1, 1930.

It is evident from the evidence that the general plan of operation of the dumping ground adopted by the city provided for the consumption of garbage, trash and other inflammable refuse by open fires. It is undisputed that winds from the north occasionally blew with considerable intensity at certain times of the year and carried charred and partly burned paper onto the property of respondent and his near neighbors. If the proper municipal authorities had notice of a dangerous or defective condition of the dumping ground prior to the fire and permitted such condition to continue for an unreasonable time; if the fire which consumed respondent's property had spread or was carried from a fire on the dumping ground burning at a place, or one of the places, where fires were to be kindled in accordance with the plan of operation established by the municipal authorities and in operation at the time of the destruction of respondent's property; and if the fire was not spread from one wrongfully started by another agency such as trespassers on the city property, then we are of the opinion that a dangerous or defective condition of the public grounds, works or property of the City of Riverside existed which would render it liable for damages to the property of respondent. (*Huff* v. *Compton Grammar School Dist.*, 92 Cal. App. 44 [267 Pac. 918].)

Did the fire in question spread from the regular burning area in the dumping ground, or did it spread from some other fire, probably from one kindled by trespassers? If the latter be true there would be no liability on the part of the city because there had been no notice of this fire and it could not be considered a dangerous or defective condition maintained by the city. We presume, however, that we must accept the testimony of respondent that the change in the burning area was not made by the city until after his fire and that at that time the city permitted the burning at any place in the dumping ground, although this portion of his evidence is met by clear evidence to the contrary. Accepting this portion of his testimony, it would support an inference by the jury that the fire in question spread from a burning area maintained or permitted by the city in its plan of operation of the dumping ground,

which would bring the case within the rule of the statute of 1923 making the city liable for injuries to property resulting from the dangerous or defective condition of public grounds, works or property.

Appellant relies upon the case of *Miller* v. *City of Palo Alto, supra,* as establishing a rule under which respondent cannot recover. This case went up on appeal from a judgment entered after a demurrer to the complaint had been sustained. The complaint alleged that on or about October 9, 1926, the City of Palo Alto deposited certain hot and burning materials from its garbage incinerator on property about one-quarter of a mile from that of the plaintiffs, from which fire was spread to their property. As remarked by the Supreme Court, the complaint ''alleges a single act of negligence on the part of the city''. It contained no allegation from which it could be made to appear that the city maintained a dangerous or defective condition of its property.

Appellant maintains that no sufficient notice was given of the defective or dangerous condition existing at the dumping ground. We have already mentioned the notice that was given the city council of the City of Riverside by the delegation, including respondent, which appeared before that body in 1929. In the summer of 1930 respondent complained several times to Mr. Lohrli, a councilman of the City of Riverside, of the fire hazard created by the burning of trash on the city dumping ground. This was more definite notice than was held to be sufficient in *Boyce* v. *San Diego Union High School Dist.,* 215 Cal. 293 [10 Pac. (2d) 62].

The trial court at the request of respondent gave the following instructions to the jury:

''Negligence is the doing of some act which a reasonably prudent man would not do, or the omission to do something which a reasonably prudent man would do, actuated by those considerations which ordinarily regulate the conduct of human affairs. It is the failure to use ordinary care or skill by one sought to be charged with negligence in the management of his property or person. It is not intrinsic or absolute, but relative, and always relates to circumstances of time, place or persons.''

"Section 1714 of the Civil Code of this state lays down the law that 'everyone is responsible not only for the result of his wilful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, wilfully, or by want of ordinary care, brought the injury upon himself.' The word 'negligence' as used in these instructions means the same thing as the expression 'want of ordinary care', as used in the quotation from section 1714 of the Civil Code, which I have just read to you. It is opposed to diligence or carefulness and is never absolute or intrinsic, but is always relative to some circumstance or circumstances of time, place or person. It must be determined in all cases by reference to the situation and knowledge of the parties, and on the attendant circumstances."

"You are instructed that, although the plaintiff must not only prove by a preponderance of the evidence that the defendant was guilty of negligence proximately contributing to or causing the damage complained of, this rule does not require demonstration of the connection between the proved or admitted negligence, if any, and the resulting injury. It is not necessary that an eye witness be produced to testify directly to the fact. The connection may be made by circumstantial evidence in the same way that any other fact can be proved."

"You are instructed that the defendant had a right to use its property for any legitimate purpose; but, on the other hand, the owner of property must use the same in such a manner as not to infringe upon the rights of another."

The trial judge, at the request of appellant, correctly instructed the jury concerning the liability of the city under the provisions of section 2 of the act of the legislature approved June 13, 1923, *supra.*

The law of general negligence, except in so far as we have already indicated, has no application to this case, and the quoted instructions as requested by respondent should not have been given by the court. The rules there stated conflict with those announced in the instruction given at the request of appellant, which correctly stated the substance of section 2 of the act approved June 13, 1923. These contradictory instructions might well have confused

the minds of the jurors upon the true rules of law governing their deliberations and applicable to the facts of the case. "The giving of conflicting instructions upon a material point is undoubtedly error." (*Treadwell* v. *Nickel,* 194 Cal. 243, 271 [228 Pac. 25, 37].) Error in instructions is not necessarily reversible error. (Sec. 4½, art. VI, Const.; *James* v. *E. G. Lyons Co.,* 147 Cal. 69 [81 Pac. 275].) Whether or not the error committed in giving conflicting instructions "is prejudicial depends upon the particular circumstances of each case" (*Barkhaus* v. *Producers Fruit Co.,* 192 Cal. 200 [219 Pac. 435, 439]). We must, therefore, determine whether or not the error committed in giving the conflicting instructions was sufficiently prejudicial to require a reversal of the judgment.

We have already gone to some length in detailing the evidence. From what we have said it appears that on some of the questions involved there is no dispute between the parties; on others, the evidence is hopelessly conflicting; on still others the evidence on which respondent must rely is very meager, with the seeming weight against him. We have held that this meager evidence furnished support for the implied findings which the jury made in reaching its verdict. There still remains the question of whether or not the erroneous instructions given by the trial court at the request of respondent tended to confuse or mislead the jury by giving it mistaken rules of law under which it could reach the verdict which it returned. The answer to this question must be in the affirmative.

There is abundant evidence in the record to support the following theory: That for more than nine months before the fire, free entrance to the city dumping ground was prevented by a fence, the gates in which were kept locked; that a caretaker was in charge whose duty it was to carry out the city's plan of operation; that all garbage, trash and other rubbish was to be dumped and burned only in a central area and not at any other place; that on January 18 and 19, 1931, up to the time of the fire there were no fires in the burning area except that some fish heads, fish hides and chicken entrails were smoldering there; that on January 18, 1931, some unidentified trespassers entered the dumping ground and dumped a considerable quantity of trash and rubbish at a point about 400 feet south of the regular

burning area, being the place where respondent and his witnesses saw the fire; that these trespassers lighted this trash and rubbish, burning embers from which were carried by the wind into the salt grass south of the dumping ground, causing the fire which spread to and destroyed respondent's property. If the jurors had been of the opinion that these facts had been established by a preponderance of the evidence and the instructions on general negligence had not been given it would have been their duty to return a verdict in favor of the city, because the dangerous condition was not created by the city in its maintenance or operation of its dumping ground, but by trespassers, and further, because the responsible city officials had no notice of the dangerous condition created by the trespassers. With the instructions on general negligence in mind the jurors might well have concluded under the facts stated that the caretaker either saw or should have seen the fire started by the trespassers; that as a reasonably prudent man he should have known that a fire of the size described created a dangerous hazard to adjoining property with the strong wind blowing from the north; that he should have extinguished the fire himself or called assistance so that it could be extinguished and the danger of its spreading to adjoining property be obviated. If the jury thus arrived at its verdict, it was not based upon a liability of the city for injuries to property resulting from a dangerous or defective condition of its public grounds, works or property, but upon the negligence of a city employee who failed to do those things which a reasonably prudent person should have done under the circumstances. As we have said before, negligence of the caretaker can furnish no support for the judgment under the law and pleadings in this case. We have concluded that the erroneous instructions were sufficiently prejudicial to require a reversal of the judgment.

Appellant urges that respondent was guilty of contributory negligence as a matter of law because of his alleged violation of the terms of the city ordinance. We have examined the record carefully and cannot find that the evidence supports this contention. Here the question of contributory negligence was one of fact for the jury.

Judgment reversed.

Barnard, P. J., and Jennings, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 2, 1933.