**SPALDING v. UNITED STATES**
(two cases).

Nos. 7348–Y, 7349–Y.

District Court, S. D. California, Central
Division.

Jan. 16, 1937.

958

Miller, Chevalier, Peeler & Wilson (by Joseph D. Peeler), all of Los Angeles, Cal., for plaintiff.

Peirson M. Hall, United States Attorney, by E. H. Mitchell and Eugene Harpole, Special Ass't. U. S. Attorneys, all of Los Angeles, Cal., for defendant.

YANKWICH, District Judge.

The plaintiff, Caroline C. Spalding (to be referred to as "the taxpayer"), brought two actions for the recovery of income taxes alleged to have been collected erroneously from her for the years 1929 and 1930. Recovery is sought of $27,125.39 for 1929, and for 1930 recovery is sought of $31,612.39 with interest. The facts under which the controversy arises have been stipulated.

During 1929, the plaintiff and her husband, Silsby M. Spalding, owned a ranch bordering on the Pacific Ocean in Santa Barbara County, Cal. On March 21, 1929, each of them obtained a permit to prospect for oil and gas upon certain state tidelands adjoining their ranch. Plaintiff's permit was designated as Permit No. 93, and her husband's as Permit No. 92.

Prior to the expiration of the time limit set forth in the permit, the plaintiff was developing the property at her own expense and on her own responsibility. On November 16, 1929, a well was brought in, and on November 23, 1929, plaintiff obtained Lease No. 93 from the State of California on the property. On December 19, 1929, plaintiff entered into a "drilling agreement" with the Pacific Western Oil Company (to be referred to as "the Oil Company"), which designated the plaintiff as "Owner" of Lease No. 93, and the Oil Company as "Contractor," and provided that the Oil Company should develop and operate wells on the lease.

More particularly, the agreement provided: The Oil Company agreed to drill all the wells required to be drilled by Lease No. 93, to do all development work and operations, to perform all other covenants and agreements contained in the lease, and to furnish all machinery, appliances, equipment, materials, and labor whatsoever necessary for these purposes. It agreed to pay, in the name of the plaintiff, to the State of California, all royalties under the lease, whether in money or in kind. The plaintiff agreed to pay the Oil Company 66⅔ per cent. of the net sums received on account of the sale of all oil and gas and casinghead gasoline produced under and during the life of the lease, i. e., twenty years. Provision was made for the payment of such amounts by the purchaser to the contractor by "proper division order." If the state, thereafter, should elect to take its royalty in kind, the amount to which the contractor would *become entitled would be 61⅔ per cent. of the amount* it otherwise would have been entitled to receive. All oil and gas and casinghead gasoline produced and saved from the leased lands should, immediately, upon its production and saving, belong to the plaintiff, but the contractor should have the duty of caring for it, while in storage, and that the contractor should operate under the agreement, at all times, as an "independent contractor." During the life of the agreement, the plaintiff had the right to

inspect, personally or by her agents or representatives, the work done, as well as all structures, machinery, and appliances constructed or installed on the leased premises by the contractor. The contractor agreed to keep true and correct logs of any and all wells drilled upon the leased lands, and true and correct accounts and gauger's books, showing all production of oil each month, and, before such delivery, she had the right of inspection during all business hours. Whether assessed against the plaintiff or the contractor, the contractor was to pay all taxes, assessments, charges, or imposts levied or assessed or imposed against or upon "Lease No. 93" and the lands covered by it and all oil, gas, casinghead gasoline, tanks, structures, improvements, machinery, and property placed upon the leased lands and upon the littoral lands by the contractor, under the terms of the agreement. The plaintiff agreed to repay the contractor one-third of all such taxes, assessments, charges, or imposts, except those assessed against or imposed upon any structures, improvements, machinery, and property placed thereupon by the contractor. The agreement was effective for all purposes from November 26, 1929, throughout the life of the lease, or any renewal, extension, or substitute thereof, unless sooner terminated by agreement pursuant to certain specified conditions. The contractor was obligated to make and render to the State of California all statements, reports, and other documents required by law to be made or rendered to it in connection with the laws. The agreement also discloses that the adjacent littoral lands belong to the plaintiff and her husband, Silsby M. Spalding, as cotenants, and that tide or submerged lands adjoining the same are covered by Lease No. 92, granted by the state to the Pacific Western Oil Company as assignee of the husband. The littoral lands themselves were subject to a community oil lease between the plaintiff and her husband and the Pacific Western Oil Company.

Under a supplemental agreement, executed on the same day, the Oil Company agreed to pay to the plaintiff an amount of money equal to her expenditures in acquiring and developing the lease, and also to release her from her liability previously incurred to reimburse the Oil Company for the development work done by them for her on a "cost plus 10 per cent." basis.

While these agreements were not executed until December 21, 1929, they were applied retroactively to November 25, 1929.

The drilling agreement provided that it "shall be effective for all purposes as though executed on November 25, 1929." The supplemental agreement in paragraphs 2 and 3, and Exhibit B attached to it, charged plaintiff with the operating expenses from November 16, 1929, when the well came in, to November 25, 1929. On the dates when the well was brought in and when Lease No. 92 was executed, the Oil Company had no interest whatever in the property and plaintiff was acting solely as principal on her own behalf.

As a result of the operations carried on by the Oil Company on the leased premises, the total proceeds from the sale of oil and gas produced during the year 1929 amounted to $76,313.35, of which amount there was paid to the State of California a 5 per cent. royalty, or $3,815.67. Of the balance of $72,497.68, the Oil Company received $47,059.89 and the plaintiff received $25,427.79. During that year, the plaintiff paid certain expenses, apparently in accordance with the agreement of December 19, 1929, to reimburse the Oil Company on account of certain expenditures required to be paid by it, amounting to $5,791.17, with the result that the net proceeds received by the plaintiff in 1929, both before and after November 26th by reason of the production and sale of oil and gas products from the leased premises during that year, amounted to $59,622.20.

As a result of the same operations, the total proceeds from the sale of oil and gas produced during the year 1930 amounted to $1,054,485.79, of which amount there was paid to the State of California a 5 per cent. royalty, or $53,731.98. Of the balance of $1,000,753.81, the Pacific Western Oil Company received $662,694.45 and the plaintiff received $338,059.30. During that year, the plaintiff paid certain expenses, apparently in accordance with the agreement of December 19, 1929, to reimburse the Oil Company, on account of certain expenses required to be paid by it, amounting to $43,337.98, with the result that the net proceeds received by the plaintiff in 1930 by reason of the production and sale of oil and gas products from the leased premises during that year amounted to $294,721.38.

On her 1929 return, plaintiff did not include as taxable income any amounts received by her as lessee under State Lease No. 93, claiming that they were not subject to taxation by the Federal Government. Upon audit of her return for 1929, defendant included in taxable net income a net amount of $62,899.05, after allowing a deduction of $28,066.22 for depletion. This resulted in an additional tax which was paid by plaintiff, who later filed the claim for refund, which forms a basis for one of the actions brought.

For the year 1930, plaintiff included as taxable income amounts received by her as lessee under State Lease No. 93 and thereafter filed a claim for refund, which forms a basis for another of the actions brought.

Upon audits of both the 1929 and 1930 returns, the defendant allowed percentage depletion deductions based upon the gross amounts received by plaintiff under Lease No. 93, after deducting royalties paid to the State of California. However, in amended answers filed, at the hearing of these cases, the defendant has raised a new issue on depletion, claiming that in determining the *gross income* of the plaintiff under Lease No. 93, there must be deducted all amounts paid by her to the Oil Company under the drilling agreement.

Two issues are presented—one raised by the taxpayer, the other by the Government. The issue raised by the taxpayer arises under section 22(a) of the Revenue Act of 1928 (26 U.S.C.A. § 22(a) and note), which reads: "(a) General definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever."

■ The plaintiff's claim for refund is grounded upon the proposition that the net income derived by her, during the years 1929–30, as lessee under the California tideland lease was not taxable. This for the reason that the tidelands are held by the State of California in trust for a public purpose, and that, consequently, to tax the income derived by her under the lease from such lands is to tax an instrumentality of a state government. The principle brought into play is the well-recognized one which extends immunity from federal taxation to all instrumentalities of the state through which it exercises its sovereign powers. Metcalf & Eddy v. Mitchell (1926) 269 U.S. 514, 46 S.Ct. 172, 70 L.Ed. 384; Willcuts v. Bunn (1931) 282 U.S. 216, 51 S.Ct. 125, 75 L.Ed. 304, 71 A.L.R. 1260; Indian Territory Illuminating Oil Company v. Board of Equalization (1933) 288 U.S. 325, 53 S.Ct. 388, 77 L.Ed. 812.

The taxpayer insists that these principles should be applied to the facts in her case, as they were in Burnet v. Coronado Oil & Gas Co. (1932) 285 U.S. 393, 52 S.Ct. 443, 445, 76 L.Ed. 815. In that case, the court, by a divided court, held that the proceeds derived from leasing to a private corporation by the State of Oklahoma of some of its school lands for the extraction of oil and gas were not taxable. The gist of the decision is contained in the last paragraph of the opinion: "Here the lease to the respondent was an *instrumentality of the state for the purpose of carrying out her duty in respect of public schools.* To tax the income of the lessee arising therefrom would amount to an imposition upon the lease itself." (Italics added.) [1]

■ We cannot agree to the taxpayer's contention. The tidelands of California are held by the state in trust for the people for the purpose of navigation, commerce, and fishery. Constitution of California, art. 15, § 2; Borax Consolidated v. Los Angeles (1935) 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9; Illinois Central Railroad Co. v. Illinois (1892) 146 U.S. 387, 452, 13 S.Ct. 110, 36 L.Ed. 1018; Forestier v. Johnson (1912) 164 Cal. 24, 127 P. 156; City of Oakland v. Buteau (1934) 219 Cal. 745, 29 P.(2d) 177; Boone v. Kingsbury (1928) 206 Cal. 148, 273 P. 797.

While the state is prohibited from alienating the tidelands (Constitution of California, art. 15, § 3), general leasing statutes allowing their leasing exist. Act 6345, 2 Deering's General Laws of California (1931) p. 3468; Act 6351, 2 Deering's General Laws (1931) p. 3473; Act 8418, Deering's General Laws (1931) p. 4700. The control of some of the state's tidelands has also been transferred from

---

[1] The court's recent tendency is to limit strictly the application of the exemption: See Taher v. Indian Territory Illuminating Oil Co. (1936) 57 S.Ct. 334, 81 L.Ed. ——.

the state to several of its largest cities and counties, through legislative enactments.

In determining immunity of governmental agencies from taxation, a distinction is drawn between governmental and proprietary functions. The distinction grew out of the doctrine of the immunity of the sovereign from suit. The ground for this doctrine has been stated to be "that there can be no legal right as against the authority that makes the law on which the right depends." Kawananakoa v. Polyblank (1907) 205 U.S. 349, 27 S.Ct. 526, 527, 51 L.Ed. 834; The Western Maid (1921) 257 U.S. 419, 42 S.Ct. 159, 66 L.Ed. 299; Berton v. All Persons (1917) 176 Cal. 610, 170 P. 151; Heron v. Riley (1930) 209 Cal. 507–517, 289 P. 160. This ground has been contested vigorously by students: Borchard, Governmental Responsibility in Tort (1927) 36 Yale Law Journal, 575, 1039. Whatever the true origin of the doctrine, it is firmly established in American law. The broadening of the scope of governmental activities, however, has led to the modification of the rule in the absolute form in which we find it stated in early cases. Out of this, has arisen the modified doctrine which grants immunity for tort to the exercise of strictly governmental functions only and denies it to those functions which, although exercised by public and governmental bodies, are proprietary. South Carolina v. United States (1905) 199 U.S. 437, 26 S.Ct. 110, 50 L.Ed. 261, 4 Ann.Cas. 737; Indian Motocycle Co. v. United States (1930) 283 U.S. 570, 51 S.Ct. 601, 75 L.Ed. 1277; Chafor v. City of Long Beach (1917) 174 Cal. 478, 163 P. 670, L.R.A.1917E, 685, Ann.Cas.1918D, 106; Morrison v. Smith Bros. (1930) 211 Cal. 36, 293 P. 53; Kellar v. City of Los Angeles (1919) 179 Cal. 605, 178 P. 505; Municipal Bond Company v. City of Riverside (1934) 138 Cal.App. 267, 32 P.(2d) 661; Pittam v. City of Riverside (1932) 128 Cal.App. 57, 16 P.(2d) 768; Bates v. Escondido Union High School District (1933) 133 Cal.App. 725, 24 P.(2d) 884; Crone v. City of El Cajon (1933) 133 Cal.App. 624, 24 P.(2d) 846; and see David, Municipal Liability in Tort in California, 6 Southern California Law Review (1933) 269, 7 Southern California Law Review (1933) 48. This distinction is recognized in the realm of taxation. Burnet v. Coronado Oil & Gas Company, supra, holds that the immunity of state instrumentalities from federal taxation applies only when governmental functions are exercised. But although public property be involved, when the property is not devoted by a state or municipality to governmental purposes, but is leased to others for private purposes, such as the purpose of revenue, the immunity does not apply. This was the ruling in Burnet v. A. T. Jergins Trust (1933) 288 U.S. 508, 53 S.Ct. 439, 77 L.Ed. 925. There the court held that the lessee's income from an oil and gas lease covering a tract owned by a municipality, and used by it for a water supply, was taxable. There runs through that case and other cases a fundamental distinction which seems to have been overlooked in many instances—the distinction between a *public purpose* and a *governmental purpose*. They are not the same. A purpose *may be* public and yet *not be* governmental. See Chafor v. Long Beach, supra. So that where public property is devoted by a public body not to the exercise of governmental functions essential to the exercise of its sovereignty, but is rented or leased to others for revenue purposes, the revenues going into the general fund and not being devoted to a special governmental function, the income derived by the lessee is taxable by the federal government.

The principle *(as applied to responsibility for tort)* is stated succinctly in Worden v. New Bedford (1881) 131 Mass. 23, 41 Am.Rep. 185:

"A city or town is not liable to a private citizen for an injury caused by any defect or want of repair in a city or town hall or other public building erected and used solely for municipal purposes, or for negligence of its agents in the management of such buildings. This is because it is not liable to private actions for omission or neglect to perform a corporate duty imposed by general laws upon all cities and towns alike, from the performance of which it derives no compensation.

"But when a city or town *does not devote such building exclusively to municipal uses, but lets it or a part of it for its own advantage and emolument, by receiving rents, or otherwise, it is liable* while it is so let in the same manner as a private owner would be." (Italics added.)

It has been recognized in several California cases. In Boothby v. Town of Yreka City (1931) 117 Cal.App. 643, 4 P.(2d) 589, 592, it is said: "While the erection and maintenance of an engine

house by a city is governmental, it is unnecessary to cite authorities to show that when a city *leases a portion of its property, as was done in this case, it is proprietary in character."* (Italics added.) See, also, Benton v. City of Santa Monica (1930) 106 Cal.App. 339, 289 P. 203, at page 204. The right to lease tidelands for strictly private purposes is recognized in California. See Pacific Coast Steamship Company v. Kimball (1896) 114 Cal. 414, 46 P. 275. And the special act allowing the leasing for oil purposes (St. 1921, p. 404, as amended by St.1923, p. 593) was sustained by the Supreme Court of California as involving a *public use,* although not embraced within the usual purposes for which tidelands are held, namely, the development of commerce, navigation, and fishery. In a vigorous dissent, Mr. Justice John W. Shenk denied the right of the Legislature "to determine that all of the tide and submerged lands along the Pacific Coast of California may be used *for any private purpose* requiring the building of structures which would impede the free access of water craft, large or small, to the shore line, or which would prevent the free use of the shores of the sea and its adjacent waters for the purpose of fishery." Boone v. Kingsbury, supra, 206 Cal. 148, 273 P. 797, at page 818. (Italics added.)

That the leasing of a portion of the tidelands to private concerns for use even in aid of navigation is the exercise of a private and proprietary and not a governmental function was held directly in Los Angeles Athletic Club v. Board of Harbor Commissioners of Los Angeles (1933) 130 Cal.App. 367, 20 P.(2d) 130, 135. In that case, under the grant of its tidelands by the state, the city of Los Angeles, through its Harbor Board, leased to the Los Angeles Athletic Club certain of its tidelands for a yacht harbor. The lease did not comply with the requirement of the Los Angeles City Charter that work thereon should be begun within ninety days from the date of the grant. Upon the ground that the title to the tidelands being held by the city in trust for *governmental purposes,* no estoppel could arise from the acquiescence of the Harbor Board in the failure of the Athletic Club, for a long period of years, to commence any improvements, I sustained the board in revoking the grant. The District Court of Appeal, however, thought otherwise. It held that in leasing the tidelands, the city acted in a private or proprietary capacity, saying: *"It*

*being thus determined that in the lease to appellant respondent city was not exercising a governmental function but a private or proprietary one, it follows that the lease granted must be construed according to the same principles of construction as apply to a lease between any private parties.* 'As the city had a right to lease a wharf for private use, the grant must be judged like any other, and we cannot put a condition upon the estate which is not expressed or clearly implied.' Pacific Coast S. S. Co. v. Kimball, supra. 'It is well settled that the contracts of a municipal corporation, when exercising other than its governmental functions, and within the limits of its charter powers, are construed by the same laws that govern the contracts of private parties. Thus the doctrine of estoppel in such a contract may be invoked on behalf of or against a municipality.' " (Italics added.) The Supreme Court, by denying a hearing (although by a divided court), approved the doctrine.

It is thus apparent, both upon principle and upon the basis of the cases given, that the leasing of the tidelands by the State of California under the leasing act for the purpose of exploration and exploitation *is not the exercise, through an agent, of a governmental function.* See Bankline Oil Co. (1936) 33 B.T.A. 910. The funds derived by the state are paid into the general fund, to be used for any purpose, whether strictly governmental or public, except when the tidelands are school lands. And there is no evidence in the record showing that the particular lease is upon school lands. We are, therefore, of the view that the case is governed by the decision in Burnet v. Jergins Trust, supra, and that the income derived by the taxpayer as lessee under the oil lease with the State of California is subject to federal taxation.

The determination of this question against the taxpayer calls for the determination of the question of depletion raised by the Government. This arises under section 114(b) (3) of the Revenue Act of 1928 (26 U.S.C.A. § 114 note), which reads:

"(b) Basis for depletion—* * *

"Percentage depletion for oil and gas wells. In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed

without allowance for depletion) from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph."

■ The Government contends that it allowed the plaintiff erroneously a deduction from gross income for depletion based upon the entire production of gas and oil under Oil Lease No. 93, instead of merely upon the one-third of such production. The Government claims that plaintiff's taxable income was understated in an amount equal to two-thirds of the sum allowed as a deduction for the depletion of oil and gas produced under the lease. The enactment of the amendment of 1928 to section 114(b) (3) of the Revenue Act of 1928 was made necessary by the confusion which the depletion provision of earlier acts had created. In applying the provisions to oil leases, emphasis had been placed upon the title which taxpayer had in the property. 2 Paul & Mertens Law of Federal Income Taxation (1934) § 21.18. The amendment changed the basis of computation to *production from oil and gas*. As said by the Supreme Court in Helvering v. Twin Bell Oil Syndicate (1934) 293 U.S. 312, at page 321, 55 S.Ct. 174, 178, 79 L.Ed. 383: "The phrase, we think, points only to the *gross income from oil and gas*. Compare United States v. Dakota-Montana Oil Co., 288 U.S. 459, 461, 53 S.Ct. 435, 77 L. Ed. 893; Greensboro Gas Co. v. Commissioner, 30 B.T.A. 1362. So restricted it presents no difficulty where the owner of the land is also the operator, and there is none where the lessee turns over *royalty oil in kind to the lessor, for the retained oil, in that case, is the base for the lessee's computation* of depletion and the royalty oil that for the lessor's." (Italics added.) And see Burnet v. Harmel (1932) 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199; Signal Gasoline Corporation v. Commissioner (C. C.A. 9, 1933) 66 F.(2d) 886.

■ In determining what persons are entitled to depletion, the Supreme Court has evolved the doctrine of "economic interest," under which any person who has acquired, by any instrument, an economic interest in oil or oil-bearing property is entitled to depletion. This doctrine is thus set forth in Palmer v. Bender (1933) 287 U.S. 551, at page 558, 53 S.Ct. 225, 227, 77 L.Ed. 489: "In the present case the two partnerships acquired by the leases to them, complete legal control of the oil in

place. Even though legal ownership of it, in a technical sense, remained in their lessor, they, as lessees, nevertheless acquired an economic interest in it which represented their capital investment and was subject to depletion under the statute. Lynch v. Alworth-Stephens Co., supra [267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660]. *When the two lessees transferred their operating rights to the two oil companies, whether they became technical sublessors or not, they retained, by their stipulations for royalties, an economic interest in the oil, in place, identical with that of a lessor.* Burnet v. Harmel; Bankers' Pocahontas Coal Co. v. Burnet, supra [287 U.S. 308, 53 S.Ct. 150; 77 L.Ed. 325]. Thus throughout their changing relationships with respect to the properties, the oil in the ground was a reservoir of capital investment of the several parties, all of whom, the original lessors, the two partnerships, and their transferees, were entitled to share in the oil produced. Production and sale of the oil would result in its depletion and also in a return of capital investment to the parties according to their respective interests. The loss or destruction of the oil at any time from the date of the leases until complete extraction would have resulted in loss to the partnerships. Such an interest is, we think, included within the meaning and purpose of the statute permitting deduction in the case of oil and gas wells of a reasonable allowance for depletion according to the peculiar conditions in each case." (Italics added.)

■ In applying these principles to the facts here, it is well to advert to the law of California relating to the nature of the lessee's interest in an oil lease and to the statute under which the tideland lease was made. Under California law, an operating lessee under a lease for a term of years, or so long as oil shall be produced in paying quantity, "has an interest or estate in real property in the nature of a profit á prendre, which is an incorporeal hereditament, and that the assignee of a royalty interest in oil rights under an assignment by the landowner also has an interest or estate in real property in the nature of an incorporeal hereditament." Callahan v. Martin (1935) 3 Cal.(2d) 110, 43 P.(2d) 788, 792, 101 A.L.R. 871.

■ Royalty is rent, and the right to receive future rents or royalties is an interest in land in the nature of an incorporeal

964

hereditament. Callahan v. Martin, supra; United States v. Noble (1915) 237 U.S. 74, 35 S.Ct. 532, 59 L.Ed. 844; Dabney-Johnston Oil Corp. v. Walden et al. (1935) 4 Cal.(2d) 637, 52 P.(2d) 237; Standard Oil Co. of California v. John P. Mills Organization (Cal.App.1933) 27 P.(2d) 650; Domestic and Foreign Petroleum Co. v. Long (1935) 4 Cal.(2d) 547, 51 P.(2d) 73. See, also, Yankwich, Nature of Oil Leases, 8 L. A. Bar Association Bulletin, (1933) 1931; Kimbrough, Nature of Landowner's Interest in California, and Walker, The Nature of the Lessee's Interest (1936) 25 California Law Review, 220, 230. The fact that rent is payable in money "does not make it any the less a profit issuing out of the land." United States v. Noble, supra, 237 U.S. 74, at page 81, 35 S.Ct. 532, 535, 59 L.Ed. 844.

█ We advert briefly to the nature of the California Tideland Oil Leasing Act. Its declared aim is to reserve the minerals in state lands and to provide for granting permits or leases to prospect for and take the minerals. The Surveyor General of the State, upon the payment to him of 50 cents per acre, may grant to persons prospecting permits, giving them the right, for a period not to exceed two years, to prospect for oil or gas upon not exceeding 640 acres of land upon which there are deposits of oil belonging to the state and which are not within any known geological structures or a producing oil or gas field. Operations must begin within six months after the date of the permit, and one oil well at least must be drilled within a year to a depth of not less than 1,000 feet unless valuable deposits of oil and gas are discovered sooner; or to a depth of 2,000 feet within two years unless valuable deposits of oil or gas are discovered sooner. Upon establishing to the satisfaction of the Surveyor General that valuable deposits of oil and gas have been discovered within the limits of the land embraced within the permit, the permittee becomes entitled to a lease to (ordinarily) one-fourth of the land embraced in the prospecting permit. The lease is required to be for twenty years at a royalty of 5 per cent. in amount or value of the production and the annual payment in advance of a rental of one dollar per acre. Only one oil or gas permit may be issued to any one person or corporation. The lease is not assignable except with the consent of the Surveyor General. The money received by the Surveyor General under the provisions of the act which may accrue from state school lands is payable into the school fund; the others are payable into the general fund. 2 Deering's General Laws of California (1931) Act 6341.

If the drilling agreement and the supplemental agreement between the plaintiff and the Oil Company are studied, the conclusion must be reached that, by them, the plaintiff has transferred to the Oil Company *all the work of development and operation required of her under the lease* with the State of California. The original agreement says so, in so many words. Title V(1) provides:

"Drilling Program.

"(a) To Comply with Lease No. 93: The said Contractor hereby agrees to drill for said Owner at the times and in the manner specified, all of the wells required to be drilled by the said Owner under the terms and conditions of the lease, *to do all work of development and operation required by the lease,* and not to do any act in connection therewith which might be violative of any provisions of the lease." (Italics added.)

*So strong was the desire of the parties* to throw the entire responsibility upon the Oil Company for everything relating to the exploitation of the lease, that, in addition to the many other protective provisions, whereby such responsibility is shifted, in the main agreement, the plaintiff disclaimed any responsibility for any defects in her title to the leases.

This clause, title II, is very significant. It reads:

"Owner's Title

"(a) Status of Lease. The said Owner hereby covenants and agrees that she has received a lease, being State Oil Lease No. 93, from the Department of Finance, Division of State Lands, of the State of California, the same having been issued pursuant to an application therefor arising upon the discovery of a valuable deposit of oil upon State Permit No. 93, heretofore issued to the said Owner as Permittee; and it is understood and agreed by and between the said Owner and the said Contractor that the said Owner shall not be liable to the said Contractor for or on account of *any legal defects in said lease* or in the Owner's title thereto occasioned by any decision of any court in connection therewith, or for any other defect

whatever in the Owner's title. A copy of said State Oil Lease No. 93 is attached hereto, marked Exhibit A, and made a part of this Agreement." (Italics added.)

If, as the plaintiff insists, the Oil Company is merely her hired agent, we have the anomalous situation of a contractor agreeing to expend hundreds of thousands of dollars upon the property of another and risking the loss of his entire investment by reason of defects in the owner's title.

It is inconceivable that one would take the risk unless engaged *in a joint venture* with the owner. It is true that throughout the lease, the plaintiff is designated as "Owner" and the operator as "Contractor." This may have been motivated by the desire to avoid an assignment which would have required the assent of the Surveyor General or by the inhibition in the statute against the granting of more than one lease to any one person or corporation. (The record discloses that *another* state tideland lease held by the plaintiff's husband [No. 92] *was assigned* to the same oil company.) Whatever the motive, by the nature of the agreements, the fact that the Oil Company was reimbursed for all the principal expenditures it had made in discovering oil, and the elaborate provisions shielding the plaintiff from liability—some of the most important of which have already been referred to or summarized in this opinion—all indicate clearly that the Oil Company had acquired a valuable economic interest in the property and the oil produced from it.

Agreements of this character, whereby, in consideration of a percentage of the production, the operation of a lease is turned over by the lessee to another, are well known in the oil industry. The law has given them recognition. See Julian v. Schwartz (Cal.App.1936) 60 P.(2d) 887. And the mere fact that the interest of the operator, in this case, is computed as "an amount equal to sixty-six and two-thirds per cent of the net sums received by the owner for and on account of the sale of all oil, gas and casinghead gasoline produced under and during the life of this agreement"—*in other words,* the fact that, by the terms of the main and supplemental agreements, the operator is vested with the right to receive two-thirds (66⅔ per cent.) of the production, *as computed in terms of money,* does not change the nature of its interest.

Contracts of this character cannot be judged by the name which the parties may have given to them. They must be judged by their purport. I do not believe that any declarations, in the main agreement, that the Oil Company has acquired *no* interest in the oil or in the lease can offset the *actual import* of the instrument itself.

The interest of the Oil Company is of a character which would be protected by the courts against any attempt of the plaintiff to destroy it, by assignment or otherwise. See Western Oil & Refining Co. v. Venago Oil Corporation (1933) 218 Cal. 733, 24 P.(2d) 971, 88 A.L.R. 1271; Julian v. Schwartz, supra; Richfield Oil Co. v. Hercules Gasoline Co. (1931) 112 Cal.App. 431, 297 P. 73.

If owners of percentage interests, to whom a lessee assigns a part of his royalty or production, are considered to have an interest in the oil to be produced (as the cases just cited hold clearly), certain it is that a corporation which, in exchange for two-thirds of the production of oil, assumes the entire burden of operation and production imposed upon the lessee in a lease executed by a sovereign state, and which, in the exploitation of the property, incurs expenditures running into hundreds of thousands of dollars and assumes sole responsibility towards all who participate in the exploitation, cannot be said to be merely a "hired man" or to be "merely working for hire." It has an economic interest expressed in a specified percentage of the oil production. In other words, it has the "economic interest in the oil, in place," of which the court spoke in Palmer v. Bender, supra. And this interest is identical with that of the plaintiff, the holder of the legal title to whom goes the remaining one-third of the oil production. And see Caroline C. Spalding (1936) 35 B.T.A. 2.

It follows, therefore, that the plaintiff is entitled to depletion only upon her share of the income received from the property, namely, the one-third of the profits from the operation of the lease under the agreements with the Oil Company.

This amount is, as to her, "the gross income from the property," for which she is entitled to the depletion provided in section 114(b) (3) of the Revenue Act of 1928 (26 U.S.C.A. § 114 note).

Judgment will be for the defendant, in accordance with the stipulated facts, as interpreted by this determination of the questions of law submitted to the court.